**UNITED STATES of America, Appellee,**

v.

**Gale WATSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Jackson HOLMES, Appellant.**

**Nos. 88–2578, 89–1033.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1989.

Decided Jan. 11, 1990.

R. Steven Brown, Springfield, Mo., for Watson.

Philip M. Moomaw, Springfield, Mo., for Holmes.

David Jones and Michael D. Hood, Springfield, Mo., for appellee.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and HEANEY, Senior Circuit Judge.

HEANEY, Senior Circuit Judge.

Two federal prisoners, Jackson Rip Holmes and Gale Watson,[1] ask this Court to decide whether they have a constitutional right to refuse the administration of psychotropic medications. We hold that federal prisoners suffering from a mental disease or defect have a qualified right to refuse such treatment. We reverse the district court's order allowing the government to forcibly medicate Holmes and remand the case to the district court to determine whether Holmes can function adequately in the prison without medication. We affirm the district court's order with respect to Watson because such treatment has been shown to be necessary to control him within the prison setting.

---

**1.** On January 13, 1989, this court directed the Clerk of Court to expedite the briefing schedule in both *United States v. Watson*, No. 88–2578, and *United States v. Holmes*, No. 89–1033, and to set both cases for oral argument before the same panel of judges. Pursuant to Eighth Circuit Rule 11(c), we now consolidate these cases for the purpose of this opinion.

## BACKGROUND

### A. *Jackson Rip Holmes*

Holmes is a thirty-seven-year old federal prisoner presently housed in the general population of the Mental Health Unit at the Medical Center for Federal Prisoners in Springfield, Missouri. On January 15, 1988, Holmes was convicted of threatening Secret Service protectee Jeb Bush, the son of George Bush, in violation of 18 U.S.C. § 879(a)(2). He is presently serving a three-year prison sentence for this crime.

Holmes is a man of obvious high intelligence. He graduated fifth in his high school class and graduated with honors from the University of North Carolina at Chapel Hill with a double major in religion and psychology. He also graduated from the University of Florida's School of Law, but apparently failed the multiple choice ethics portion of the Florida bar examination.

Holmes has received both voluntary and involuntary psychiatric treatment over the last twenty years. He apparently first consulted a psychiatrist in 1970 or 1971. Dr. M.A. Conroy, Chief Psychologist at the Springfield Medical Center, reported that Holmes was committed to the Camarillo State Hospital in California in 1978, where he was diagnosed as paranoid schizo-phrenic.[2] In 1983, Holmes spent three or four months in a Miami hospital for a condition described as "schizophrenia, chronic undifferentiated type with paranoid features." Holmes then was admitted to the Institute of Living in Hartford, Connecticut for long-term psychiatric treatment. According to Dr. Conroy, this hospitalization became involuntary in 1984 when Holmes refused to take psychotropic medication. In 1985, Holmes moved into a halfway house but subsequently was discharged for "disruptive behavior" and failure to take psychotropic medications.

Holmes was admitted to the Medical Center on February 5, 1988 for observation; and on February 29, he agreed to be admitted to the Center's mental health unit. He refused, however, to take psychotropic drugs. On May 23, 1988, the United States filed a petition to determine the mental condition of Holmes pursuant to 18 U.S.C. § 4245.[3] The government, through the psychological evaluation of Dr. Conroy, alleged that Holmes suffered from a mental disease for which he was in need of treatment with psychotropic medications.

The government bases its request to forcibly medicate Holmes on the report of Dr. Conroy and the supporting testimony of

---

2. The essential features of schizophrenia are the presence of characteristic psychotic symptoms during the active phase of the illness and a decreased level of functioning in areas such as work, social relations and self-care. *Diagnostic and Statistical Manual of Mental Disorders* 187 (3d rev. ed. 1987) [hereinafter DSM–III–R]. Psychotic symptoms may include delusions, hallucinations, incoherence, catatonic behavior, or flat or inappropriate affect (facial expressions). *Id.* at 194. Paranoid schizophrenia is one type of schizophrenia, the essential feature of which is a preoccupation with a set of systematized delusions or frequent auditory hallucinations related to a single theme. *Id.* at 197.

3. Title 18 U.S.C. § 4245 (1982) provides in part:

(a) **Motion to determine present mental condition of imprisoned person.**—If a person serving a sentence of imprisonment objects either in writing or through his attorney to being transferred to a suitable facility for care or treatment, an attorney for the Government, at the request of the director of the facility in which the person is imprisoned, may file a motion with the court for the district in which the facility is located for a hearing on the present mental condition of the person. The court shall grant the motion if there is reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility. A motion filed under this subsection shall stay the transfer of the person pending completion of procedures contained in this section.

\* \* \* \* \* \*

(d) **Determination and disposition.**—If, after the hearing, the court finds by a preponderance of the evidence that the person is presently suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility, the court shall commit the person to the custody of the Attorney General. The Attorney General shall hospitalize the person for treatment in a suitable facility until he is no longer in need of such custody for care or treatment or until the expiration of the sentence of imprisonment, whichever occurs earlier.

Dr. Donald Butts, a staff psychiatrist at the Medical Center. Dr. Conroy reported that Holmes suffers from the grandiose and persecutory delusion that former President Reagan wants to poison him and to use him as a guinea pig to test the effects of psychotropic drugs. Dr. Conroy stated:

> Jackson Holmes is currently suffering from an acute psychotic condition known as paranoid schizophrenia. His mental illness is clearly chronic and he has suffered from it for at least the past five years. There is evidence of a vast system of persecutory and grandiose delusions, which continue to expand to include the people around him, particularly authority figures. In stressful situations, Mr. Holmes' speech becomes pressured, his associations loose, and his attitude hostile. History indicates the potential for serious acting out behavior consistent with his delusional beliefs. History also indicates consistent non-compliance with the regimens of psychotropic medication. *Although Mr. Holmes to date has been able to function adequately in our very structured environment, he is nearing parole eligibility. It would be a disservice to Mr. Holmes and the community to recommend release if his condition remains untreated.*[4]
>
> \* \* \* \* \* \*
>
> In the opinion of his treating psychiatrist, that treatment would necessarily involve the administration of psychotropic medications. [Emphasis added]

Dr. Butts' testimony at the section 4245 hearing is consistent with Dr. Conroy's evaluation. He recommended the administration of a non-phenothiazine antipsychotic drug,[5] such as Haldol, Navane, or Moban, and an antidepressant such as Adapin, Sinequan, Elavil, or Tofranil. Dr. Butts testified that the anticipated effects of these medications would be decreased anxiety, a decreased investment in his delusional thought processes, an ability to interpret the behavior and presence of others as nonthreatening, and an increase in interpersonal contacts.

The diagnosis of paranoid schizophrenia and the need for antipsychotic drugs were called into doubt by the reports of Dr. Emasue Snow, a psychiatrist who evaluated Holmes at Holmes' expense, and Dr. Kenneth J. Burstin, a clinical psychologist who examined Holmes at the direction of the district court. Dr. Snow characterized Holmes' illness as a delusional disorder,[6]

---

**4.** Holmes' sentence expired in June 1989. Since then, he has remained at the Springfield Medical Center for Federal Prisoners pursuant to 18 U.S.C. § 4246 (1982). This statute provides for the continued hospitalization of prisoners due for release but suffering from mental diseases or defects such that their release would pose a risk of bodily injury or serious property damage to others. *Id.* § 4246(a). Although the statute entitles Holmes to a hearing to determine whether he continues to suffer from a mental disease or defect, this hearing has been deferred at Holmes' request.

**5.** Antipsychotic drugs, also called neuroleptics, are one of four major classes of psychotropic drugs. These drugs are used to treat mental illness. The other three types are antidepressants, antimania drugs (such as lithium) and antianxiety medications. Fentiman, *Whose Right Is it Anyway?: Rethinking Competency to Stand Trial in Light of the Synthetically Sane Insanity Defendant,* 40 U.Miami L.Rev. 1109, 1110 n. 2 (1986). There are five major groups of antipsychotics: the phenothiazines (such as Thorazine), the thioxanthines (such as Navane), the rauwolfia derivatives, the benzoquinolines and the butyrophenones (such as Haldol). *Id.*

For more information regarding the origin, classification, use, and side effects of these drugs, see *infra* p. 978. *See also* DuBose, *Of the Parens Patriae Commitment Power and Drug Treatment of Schizophrenia: Do the Benefits to the Patient Justify Involuntary Treatment?,* 60 Minn.L.Rev. 1149, 1169–70 (1976); Rhoden, *The Right to Refuse Psychotropic Drugs,* 15 Harv.C.R.–C.L.L. Rev. 363, 375–82 (1980); Comment, *Antipsychotic Drugs and Fitness to Stand Trial: The Right of the Unfit Accused to Refuse Treatment,* 52 U.Chi.L.Rev. 773, 784–86 (1985).

**6.** The essential feature of a delusional disorder is the presence of a persistent, nonbizarre delusion that is not due to any other mental disorder, such as schizophrenia. DSM–III–R, *supra* note 2, at 199. Nonbizarre delusions involve situations that can occur in real life, such as the belief that a person is being followed or poisoned. *Id.* at 202. In contrast, bizarre delusions, which usually occur in schizophrenia, involve phenomena that we would regard as totally implausible, such as the belief that a person is being controlled by a dead person. *Id.* at 194. Prominent hallucinations and bizarre delusions are not present in a delusional disorder.

rather than schizophrenia. Dr. Snow stated:

> Mr. Holmes is an intelligent man whose symptoms of extreme anxiety are elaborated in his complex delusional system in an effort to rationalize his unrealistic anticipation of impending danger. He repeatedly denied that he had made any threats or acted in a disruptive manner, and he perceives his own hostile impulses as being directed against him from others. He feels depressed and powerless against such authority as the federal government, and in turn, he attempts to control his fear by relating himself to prominent figures in elective office, and by filing many lawsuits to redress his grievances. He shows evidence of a serious mental disorder characterized by persecutory delusion and grandiose repair. He does not have symptoms of thought broadcasting, hallucinations or other bizarre manifestations generally elicited in Schizophrenic Disorders.

> \*   \*   \*   \*   \*   \*

> It is unfortunate that Mr. Holmes' delusional preoccupation incorporates the fear of psychotropic drugs since he could probably benefit from a reduction of his constant anxiety by the administration of some of the major tranquilizers. However, if he were to be helped in this manner, it would require his cooperation, and at present that is unlikely to be forthcoming. It is my understanding that the issue of his commitment involuntarily which would allow him to receive drugs without his permission, is dependent upon the prediction of dangerousness. Mr. Holmes sounds threatening at times, but I could not find any indication that he has acted upon such threats, certainly not since his admission to the Medical Center, and therefore I do not think the administration of psychotropic medication against his will is necessary.

Dr. Burstin also reviewed Holmes' file and found that, while he had been characterized as a "disruptive individual" and "dangerous" in March 1987, Holmes had adjusted well to the structured environment at the Medical Center, was holding a job assignment and performing his work satisfactorily. Observations by staff for the three-month period preceding Dr. Burstin's evaluation indicated no acting out or significant disruptive behavior. At the section 4245 hearing, Dr. Burstin testified that the forced administration of antipsychotic drugs would not necessarily reduce Holmes' anxiety. He stated, "[I]n this particular case Mr. Holmes is going to without a doubt believe that he is being harmed by those medications and what I would expect to see is (a) greater anger at staff; (b) increased complaints of side effects due to medication; (c) increased agitation and anxiety."

The district court rejected the reports of Drs. Snow and Burstin, and held that the decision of the Medical Center to administer antipsychotic medications without Holmes' consent was not arbitrary or capricious.

### B. *Gale Watson*

Gale Watson is a forty-five year old man presently serving a twenty-year sentence for a 1980 conviction for armed robbery. According to the psychiatric report submitted to the district court by the Medical Center, Watson has a fifth grade education and a long history of psychiatric problems. At the age of thirteen, Watson was hospitalized for heroin addiction and childhood schizophrenia. Throughout his teenage years, he went from one institution to another. He was arrested twice for burglary and twice for armed robbery and has intermittently served time since 1974. It appears from the record that while Watson's court-appointed attorney attempted to convince him to plead guilty by reason of insanity at trial, Watson refused. He subsequently was adjudged competent to stand trial and was convicted.

While in prison, Watson has been charged with assault three times and has had several incident reports filed against him. In 1982, he had a serious altercation with some members of the Moorish Science Temple religious organization and suffered a stab wound. Since that time, Watson has

refused to enter the general inmate population, fearing further attacks. He also has refused to cooperate with prison officials because he believes he was wrongly convicted and imprisoned. According to the government, Watson is presently in segregated confinement and remains in a locked cell twenty-three hours a day. He has received no incident reports since his transfer to the Medical Center.

In 1981, the Medical Center's psychiatric staff diagnosed Watson as suffering from a "schizoaffective disorder"[7] and an antisocial personality,[8] and treated his impairment with the antipsychotic drug, Navane, with good results. He was readmitted in 1983 and underwent the same drug treatment.

On March 14, 1988, the United States government filed a section 4245 petition alleging that Watson suffers from a manic depressive illness, manic type,[9] and an anti-social personality. The petition was based on a report by Dr. Clayton Pettipiece, a staff psychiatrist at the Medical Center.

Watson was examined by Dr. Burstin at the request of Watson's court-appointed counsel. While Dr. Burstin agreed with Dr. Pettipiece that Watson suffers from an anti-social personality disorder, he found no evidence of a manic depressive illness. He concluded that Watson did not suffer from a mental disease or defect for which hospitalization was required. The district court, however, found for the government and ordered Watson committed for treatment, including the forced administration of psychotropic drugs.

## DISCUSSION

### I. *18 U.S.C. § 4245*

Under section 4245, a prisoner who is serving in a federal facility may not be transferred to a mental hospital without the prisoner's consent or a court order. If a prisoner objects to being transferred, the court must order a hearing to determine if there is reasonable cause to believe that the prisoner may be suffering from a mental disease or defect for which he or she is in need of treatment in a psychiatric facility. 18 U.S.C. § 4245(a).

If, after a hearing, the court finds by a preponderance of the evidence that the prisoner is suffering from a mental disease or defect for which he needs treatment in a psychiatric facility, the court will commit him or her to the custody of the Attorney General, who will hospitalize the person for treatment in a psychiatric section of a prison. 18 U.S.C. § 4245(d); *see also* Continuing Appropriations, 1985—Comprehensive Crime Control Act of 1984, H.R.Rep. No. 98–1030, 98th Cong., 2d Sess. 248–49 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3404, 3430–31 [hereinafter Crime Control Act].

Congress enacted this set of procedural safeguards in response to *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). In *Vitek*, the Supreme Court held that the involuntary transfer of a state prisoner to a mental hospital implicates a liberty interest that is protected by the fourteenth amendment, and the prisoner thus is entitled to a court hearing before being transferred to a mental hospital. *Id.* at 493–94, 100 S.Ct. at 1263–64. Congress

---

7. The term "schizoaffective disorder" has been used in many different ways. DSM–III–R, *supra* note 2, at 208. It is now categorized as a disturbance during which there is either an episode of major depression or manic syndrome concurrent with symptoms of schizophrenia. *Id.* at 210.

8. The essential feature of an antisocial personality disorder is a pattern of irresponsible and antisocial behavior beginning in childhood or early adolescence and continuing into adulthood. *Id.* at 342. Diagnostic criteria include a history of truancy, physical assaultive behavior and destructive behavior, and a pattern of irresponsible behavior such as an inability to sustain consistent work, repeated criminal conduct, aggressiveness, personal recklessness and a lack of remorse. *Id.* at 345–46.

9. Manic depression is a mood disorder involving manic episodes accompanied by a major depressive episode. DSM–III–R, *supra* note 2, at 225. A manic episode is a period of abnormally and persistently elevated, expansive, or irritable mood along with an inflated self-esteem, a decreased need for sleep, pressured speech, racing thoughts, or an excessive involvement in pleasurable activities which have a high potential for painful consequences. *Id.* at 217.

extended *Vitek* to cover federal prisoners, agreeing with the Supreme Court that "judicial scrutiny is necessary to insure that the procedures preceding the transfer * * * adequately safeguard the fundamental rights of the prisoner." Crime Control Act, *supra*, at 3430.

█ In the present case, the district court held that a preponderance of the evidence supported a finding that both Holmes and Watson suffered from a mental disease or defect. This determination constitutes a finding of fact, and as such, is subject to the "clearly erroneous" standard of review governed by Fed.R.Civ.P. 52(a). *Davis v. Arkansas Dept. of Human Serv.*, 862 F.2d 173, 175 (8th Cir.1988); *Sims v. United States Dept. of Agriculture Food & Nutrition Serv.*, 860 F.2d 858, 863 (8th Cir.1988); *Cox v. Dardanell Public School Dist.*, 790 F.2d 668, 675 (8th Cir.1986).

█ After a careful review of the record, we cannot say that the district court clearly erred in finding that Holmes and Watson suffer from a mental disease or defect. The medical reports indicate that Gale Watson has a history of repeated psychiatric problems and hospitalizations. When examined by Dr. Pettipiece in February and August 1988, Watson exhibited signs of hypomania, pressured speech, impaired judgment, and delusional thinking. While Dr. Burstin examined Watson in March 1988 and found no evidence of delusional thinking or manic behavior at that time, the magistrate found that this report did not directly contradict Dr. Pettipiece's diagnosis of manic depression. Based on Watson's psychiatric history and Dr. Burstin's limited exposure to Watson, we do not believe that the magistrate erred in giving greater evidentiary weight to Dr. Pettipiece's report. The conclusion that Watson suffers from a mental disease is clearly plausible in light of the record before us.

Similarly, we find no error in the determination that Jackson Holmes suffers from a mental disease or defect.[10] The record shows that Holmes has exhibited a preoccupation with the persecutory delusion that persons associated with the Reagan and Bush administrations wish to poison him or to use him in drug experiments. He alleges that Jeb Bush had a hand in his failure to pass the Florida bar exam, in his 1983 hospitalization and subsequent involuntary treatment with antipsychotic drugs, and in his present incarceration. He lays out a very intricate plot by government officials and Republican party members to frame him and to use him as a guinea pig in drug experiments. We agree with Dr. Burstin that the likelihood that these beliefs have any basis in fact is nil and that Holmes' preoccupation with this "plot" is evidence of some type of thought disorder. Thus, we find that the district court did not err in concluding that Holmes suffers from a mental disease or defect.

█ Our review does not end here, however, because the court also granted a request by the Medical Center allowing it to force both defendants to undergo treatment with psychotropic medications. Section 4245 addresses only the question of whether a federal inmate may be transferred to a facility for psychiatric treatment. It does not define "treatment," nor does it authorize the United States to forcibly administer psychotropic drugs whenever it believes appropriate. *United States v. Bryant*, 670 F.Supp. 840, 845 (D.Minn. 1987). Because section 4245 provides no standard, we must address the issue of involuntary drug treatment irrespective of the district court's determination that Watson and Holmes are mentally ill.

## II. *The Right to Refuse Psychotropic Medication*

In *Mills v. Rogers*, 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), seven state mental patients alleged that the forcible administration of antipsychotic drugs violated their constitutionally protected liberty and privacy interests in determining for themselves whether to undergo such treatment. The district court and the court of appeals held that mental patients enjoy a

---

**10.** Although the public defender appointed to represent Holmes on appeal concedes this point, Jackson raised the issue in his *pro se* brief. Thus, we feel compelled to address it here.

constitutional right to refuse drug therapy. *See Rogers v. Okin,* 478 F.Supp. 1342, 1365–68 (D.Mass.1979), *aff'd in part and rev'd in part,* 634 F.2d 650, 653 (1st Cir. 1980). While the Supreme Court vacated the judgment of the First Circuit, it did so after accepting the premise that the United States Constitution protects the mentally ill from the unwanted administration of anti-psychotic drugs. *Mills v. Rogers,* 457 U.S. at 299, 102 S.Ct. at 2448. The Court noted:

> As do the parties, we assume for purposes of this discussion that involuntarily committed mental patients do retain liberty interests protected directly by the Constitution, *cf. O'Connor v. Donaldson,* 422 U.S. 563, 45 L.Ed.2d 396, 95 S.Ct. 2486 (1975), and that these interests are implicated by the involuntary administration of antipsychotic drugs. Only "assuming" the existence of such interests, we of course intimate no view as to the weight of such interests in comparison with possible countervailing state interests.

*Id.* at 299 n. 16, 102 S.Ct. at 2448 n. 16.

The assumption that mentally ill patients have a right to refuse treatment is due, in part, to the Supreme Court's ruling in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), in which it reaffirmed that freedom from bodily restraint has long been recognized as the "core" of the liberty interest protected by the due process clause of the United States Constitution. *Youngberg* involved a profoundly mentally retarded man with the mental capacity of an 18 month-old child who was involuntarily committed to a Pennsylvania state facility by his mother. While at the institution, Romeo was injured more than sixty times by his own violence and by other inmates. When Romeo was hospitalized for a broken arm, hospital staff members restrained him with soft arm restraints to ensure that he did not injure himself or other patients in the hospital. Romeo sought damages under 42 U.S.C. § 1983, alleging that he had been illegally restrained for prolonged periods of time.

The Supreme Court held that Romeo had liberty interests in personal safety and freedom from bodily restraint. 457 U.S. at 315–16, 102 S.Ct. at 2457–58. Since then, many courts have reasoned that the forcible administration of psychotropic drugs presents an analogous intrusion on bodily security. *See, e.g., United States v. Charters,* 863 F.2d 302, 305–06 (4th Cir. 1988) (en banc), *petition for cert. filed, stay granted,* 57 U.S.L.W. 3545 (Feb. 14, 1989) (No. 88–5525); *Bee v. Greaves,* 744 F.2d 1387, 1393 (10th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985); *Johnson v. Silvers,* 742 F.2d 823, 825 (4th Cir.1984); *Rennie v. Klein,* 720 F.2d 266, 268 (3d Cir.1983) (en banc); *United States v. Bryant,* 670 F.Supp. at 843–44.[11] We agree with this long line of cases and assume that the substantive right to be free from unwanted bodily restraint includes the right to refuse psychotropic medications.[12]

---

**11.** Many state courts have held that a mental patient has a qualified right to refuse psychotropic medications in non-emergency situations. Many of these decisions, however, are based on state law. *See, e.g., Large v. Superior Court,* 148 Ariz. 229, 714 ʌ.2d 399, 406 (1986) (state constitution); *In re Woodall,* 209 Cal.App.3d 925, 257 Cal.Rptr. 601, 607 (1989) (state statute); *Riese v. St. Mary's Hosp. & Medical Center,* 196 Cal. App.3d 1303, 243 Cal.Rptr. 241, 246 (1988) (state statute); *People v. Medina,* 705 P.2d 961, 967 (Colo.1985) (state statute and common law); *Matter of Orr,* 176 Ill.App.3d 498, 125 Ill.Dec. 885, 892, 531 N.E.2d 64, 71 (1988) (state statute); *In re Mental Commitment of M.P.,* 510 N.E.2d 645 (Ind.1987) (state statute); *In re Guardianship of Linda,* 401 Mass. 783, 519 N.E.2d 1296, 1299 (1988) (state and federal constitutional rights to privacy and bodily integrity); *Jarvis v.*

*Levine,* 418 N.W.2d 139, 148 (Minn.1988) (state constitution); *Rivers v. Katz,* 67 N.Y.2d 485, 495 N.E.2d 337, 342–43, 504 N.Y.S.2d 74, 79–81 (1986) (state constitution); *In re K.K.B.,* 609 P.2d 747, 749 (Okla.1980); *Harper v. State,* 110 Wash.2d 873, 759 P.2d 358, 361 (1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 1337, 103 L.Ed.2d 807 (1989) (state constitution); *State ex rel. Jones v. Gerhardstein,* 141 Wis.2d 710, 416 N.W.2d 883, 892–93 (1987) (federal and state constitutions).

**12.** This issue may soon be answered directly by the Supreme Court. In *Harper v. State,* 110 Wash.2d 873, 759 P.2d 358 (1988), *cert. granted, Washington v. Harper,* —— U.S. ——, 109 S.Ct. 1337, 103 L.Ed.2d 807 (1989), the Supreme Court will determine whether a state prisoner has a constitutionally protected liberty interest

As the Supreme Court acknowledged in *Youngberg*, this liberty interest is not absolute. 457 U.S. at 319, 102 S.Ct. at 2459–60. We recognize that psychotropic drugs are a technological advance in the treatment of mental illness and are considered to be a more humane and effective treatment than those used in the past. We also recognize that the safe administration of an institution, such as a psychiatric ward in a federal prison, requires that staff be allowed to restrain patients on occasion. Thus, "[t]he question * * * is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint * * * is such as to violate due process." 457 U.S. at 320, 102 S.Ct. at 2460.

### A. The Nature of the Restraint—Psychotropic Medication

The United States has stated that, if allowed, it will treat Watson's manic depression with the antimania drug lithium and that it will treat Holmes' paranoid schizophrenia with a non-phenothiazine antipsychotic, such as Haldol. Both lithium and Haldol are classified as psychotropic drugs. All of the parties agree that psychotropic drugs constitute the generally accepted treatment for schizophrenia and the major affective disorders, such as depression and manic depression. *See* Rhoden, *supra* note 5, at 375–77.

#### 1. Antipsychotic Drugs

Antipsychotic drugs are used prevalently to control the symptoms of acutely and chronically disturbed psychotic patients. Symonds, *Mental Patients' Rights to Refuse Drugs: Involuntary Medication as Cruel and Unusual Punishment*, 7 Hastings Const. L.Q. 701, 704 (1980). Although these drugs do not cure schizophrenia, they control the symptoms, often permitting patients to function outside of a hospital setting. *Id.* As the Supreme Court has noted, antipsychotic drugs are "mind-altering." *Mills v. Rogers*, 457 U.S. at 293 n. 1, 102 S.Ct. at 2445 n. 1. They affect a patient's thoughts, moods and emotions. Symptoms such as delusions, hallucinations, and disruptive or withdrawn behavior are held in remission while the drug remains in the patient's bloodstream. Symonds, *supra*, at 704. Patients frequently relapse when no longer on this medication. Rhoden, *supra* note 5, at 398.

While these drugs have provided the psychiatric community with an alternative to heavy sedation, seclusion, straightjackets, electroconvulsive therapy, and frontal lobotomies, their use is not without controversy. Patients taking antipsychotic medications sometimes experience painful side effects, including muscle spasms, restlessness, agitation, and parkinsonisms.[13]

#### 2. Antimania Medications

The drug lithium is not an antipsychotic. Rather, it is an "antimania" medication which alters the sodium transport in nerve and muscle cells. *Physician's Desk Reference* 1844 (42d ed. 1988) [hereinafter PDR]. The drug quickly reduces the frequency and intensity of manic episodes. *Id.* If properly administered and monitored, lithium rarely produces adverse side effects, but tremors, abdominal cramps, nausea, vomiting, diarrhea, unusual thirst, polyuria (increased urine excretion), and fatigue may occur. PDR, *supra*, at 1845; Symonds, *supra*, at 710. For a complete history of possible side effects, see PDR, *supra*, at 1845. Lithium toxicity, which causes damage to the central nervous system, may occur if the drug is given in excessive doses. Symonds, *supra*, at 710.

### B. Prisoners' Liberty Interest

Both Watson and Holmes have been treated with antipsychotic drugs in the past and have experienced some side effects. The desire to avoid the recurrence of these

---

in refusing antipsychotic medication. *See Washington v. Harper*, 57 U.S.L.W. 3368 (U.S. Nov. 22, 1988) (summary of questions presented).

**13.** For a more thorough discussion of these side effects, see *Bee v. Greaves*, 744 F.2d at 1390 n. 3; Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 Nw.U.L. Rev. 461, 475–76 (1977); Symonds, *supra*, at 706–08.

psychological and physiological side effects has led them to protest the decision of the Medical Center staff to administer these drugs by force. The Supreme Court held in *Vitek v. Jones*, 445 U.S. at 492, 100 S.Ct. at 1263, that the involuntary commitment of a convicted felon to a psychiatric facility significantly affected that person's right to be free from "unjustified intrusions on personal security." *Id.* The Court concluded:

> A criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from confinement for the term of his sentence, but they *do not authorize the State to classify him as mentally ill and to subject him to involuntary treatment without affording him additional due process.*

*Id.* at 493–94, 100 S.Ct. at 1263–64 (emphasis added).

Given the potential of psychotropic drugs for altering a patient's mental processes and the risk of severe side effects, including possible irreversible damage, we believe that the potential loss of liberty or intrusion on personal security for Watson and Holmes if forcibly medicated with psychotropic drugs is as great as the loss of liberty associated with the stigma of being labeled "mentally ill" in *Vitek.*

### C. Government Interests

The United States argues that, although the forced administration of psychotropic drugs may implicate a liberty interest, *Youngberg* requires only that persons such as Watson and Holmes be protected from arbitrary government action. Accordingly, it contends that a federal inmate committed to a psychiatric treatment facility may be forcibly medicated as long as a qualified professional, in the exercise of his or her judgment, finds such treatment necessary.[14]

While we agree that the *Youngberg* standard of limited review should be extended to cases involving mentally ill prisoners, we do not read that case as granting to prison officials the authority to forcibly medicate mentally ill prisoners in all cases. The holding in *Youngberg* was clearly predicated on factors not found in these cases.

In *Youngberg*, the Supreme Court held that Romeo was entitled only to an assurance that professional judgment had been exercised in deciding what care he would receive: "[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." 457 U.S. at 321, 102 S.Ct. at 2461, (quoting *Romeo v. Youngberg*, 644 F.2d 147, 178 (3d Cir.1980) (Seitz, J., concurring)). Yet, in so limiting Romeo's liberty interest, the Supreme Court focused on the factual finding that Romeo presented a

---

**14.** The dissent also adopts this interpretation of *Youngberg*. The dissent argues that as long as qualified medical personnel determine that the forced administration of psychotropic medications is in the inmate's best interest, this court should interfere in that determination only if it is arbitrary and capricious. The dissent takes this position even in a case where the unmedicated inmate can function adequately within the general inmate population and is a threat neither to himself nor to others, and where such treatment would work no change in the inmate's status within the prison facility. The dissent would allow this intrusion on Holmes' liberty interest without a showing of any government interest to be served other than to control Holmes' schizophrenia sufficiently to make him temporarily fit for release from federal custody.

Certainly, *Youngberg* does not deal with this situation. *Youngberg* holds that involuntarily committed mentally retarded persons enjoy due process rights to reasonable safety and freedom from bodily restraint, and to minimally adequate care and treatment, including such training as is reasonable in the circumstances of the case. 457 U.S. at 316–19, 102 S.Ct. at 2458–60. *Youngberg* also holds that the decisions made by qualified professionals in such matters are presumptively valid when such decisions are challenged as violating constitutional rights for the purpose of imposing section 1983 liability. *Id.* at 323, 102 S.Ct. at 2462. The Court in *Youngberg* went on to warn, however, that the State "may not restrain [involuntarily committed] residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training." *Id.* at 324, 102 S.Ct. at 2462. Here, the government does not claim that Holmes presently poses a safety risk to himself or to others, or that psychotropic medications would enable Holmes to participate in necessary training or rehabilitation.

danger to himself and to other hospital patients. The Supreme Court was obviously concerned that state officials should have the authority to control the state's ward: "The State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution. And *it may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety * * *." Youngberg,* 457 U.S. at 324, 102 S.Ct. at 2462 (emphasis added). Institutions such as federal prisons not only have a legitimate interest but also a duty to prevent injury to the mentally ill prisoner, other inmates, and staff. *Id.* Thus, due process requires that a qualified professional determine that the forcible administration of medication is, in his or her opinion, necessary to assure everyone's safety. *See Dautremont v. Broadlawns Hosp.,* 827 F.2d 291, 298 (8th Cir.1987) (Dautremont found to be a danger to himself and to others); *Rennie v. Klein,* 720 F.2d 266, 269 (3d Cir.1983) (en banc) (antipsychotic drugs may be constitutionally administered to an involuntarily committed mentally ill patient, whenever, in the exercise of professional judgment, such an action is deemed necessary to prevent the patient from endangering himself or others); *United States v. Bryant,* 670 F.Supp. at 842 (Bryant rejected food and medicine, threatened staff member with bodily harm, assaulted an unidentified person, and set fire to his cell). We believe *Youngberg* protects prison inmates from the forced administration of psychotropic drugs except when prison officials, in the exercise of their professional judgment, believe that such medication is required to control the prisoner in the general prison population.

We believe that the government misreads *Youngberg.* In that case, Romeo, the profoundly retarded plaintiff, brought a section 1983 action against the administrators of the state hospital to which he was committed. Romeo alleged that the hospital's failure to provide him with safe conditions of confinement, freedom from bodily restraints, and minimally adequate training violated his substantive due process rights under the fourteenth amend-

ment. 457 U.S. at 309, 102 S.Ct. at 2454–55. The Court held that Romeo enjoyed "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions and such training as may be required by these interests." *Id.* at 324, 102 S.Ct. at 2462. The Court also noted that "[s]uch conditions of confinement would comport fully with the purpose of respondent's commitment." *Id.* (citation omitted).

■ In Holmes' case, the government makes no claim that it wishes to train, rehabilitate, or cure Holmes. Moreover, the purpose of Holmes' confinement is to serve the term of the sentence he received for the crime of which he was convicted. This purpose dictates restraining Holmes only insofar as necessary to prevent him from harming himself or others. Evidence on the record shows that Holmes functions adequately within the general population of the Mental Health Unit of the Medical Center without psychotropic medications. Extending *Youngberg* to its fullest limit on the facts of Holmes' case does not require that he submit to the forcible administration of psychotropic medications, either to insure his own safety or that of other inmates or hospital personnel. Nor is the possibility that such medication might improve Holmes' condition sufficiently to enable his release justification for medicating him against his will. Holmes has stated that under no circumstances would he continue to take psychotropic medications following his release from prison and any improvement in his condition resulting from drug treatment will disappear shortly after the medication is stopped.

There is a dispute in the record before this Court as to whether it is necessary to medicate Holmes to control him within the general prison population. While Holmes is able to function in a controlled environment within the prison's population and is able to perform a job assignment to the satisfaction of his supervisors, he was involved in two altercations when out of this structured setting. The government conceded at oral argument that Holmes was functioning satisfactorily without drug

therapy at that time. We believe, however, that the district court did not focus on this issue and that a remand is required to develop the record further.

The government argues that it is justified in forcibly medicating Holmes because the Medical Center psychologist stated that she could not recommend his release from prison unless she could treat him with psychotropic medicE tions. We do not believe the need to prepare Holmes for release outweighs his right to refuse medication.

First, antipsychotic medication will not cure Holmes' schizophrenia. The medication may temporarily relieve Holmes of his delusions, but as soon as he is released and refuses to take his medication, his symptoms will return.[15]

Second, the question of whether Holmes is "prepared" for release is not properly before this Court. The proceeding for determining whether a mentally ill prisoner may be released is governed by 18 U.S.C. § 4246.[16] If a court determines that a pris-

---

**15.** The facts of Holmes' case contrast with those in *United States v. Charters*, 863 F.2d 302 (4th Cir.1988) (en banc). In that case, the Fourth Circuit upheld the district court's order that the defendant be subjected to the forcible administration of psychotropic medications when such medications were recommended by medical professionals exercising their specialized medical judgment. *Id.* at 305, 308, 312. In *Charters*, however, the defendant's condition previously had improved during treatment with antipsychotic medication. *Id.* at 304–05. Additionally, the defendant had been adjudged incompetent to stand trial when he was committed to the facility that sought to administer the medications, and the defendant's treating psychiatrist believed that psychotropic medications could improve his mental state sufficiently so that he could be tried for his offense. *See id.* at 304–05.

A similar governmental interest in maintaining or restoring Holmes' mental competence is absent here because Holmes already has been tried for and convicted of his offense. Moreover, no evidence suggests that any improvements which psychotropic medications might cause in Holmes' condition would last beyond his release from confinement. We express no opinion, however, on the propriety of administering psychotropic medications in order to render a mentally incompetent defendant competent to stand trial.

**16.** § **4246. Hospitalization of a person due for release but suffering from mental disease or defect.**

(a) **Institution of proceeding.**—If the director of a facility in which a person is hospitalized certifies that a person whose sentence is about to expire, or who has been committed to the custody of the Attorney General pursuant to section 4241(d), or against whom all criminal charges have been dismissed solely for reasons related to the mental conditions of the person, *is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available,* he shall transmit the certificate to the clerk of the court for the district in which the person is confined.

The clerk shall send a copy of the certificate to the person, and to the attorney for the Government, and, if the person was committed pursuant to section 4241(d), to the clerk of the court that ordered the commitment. The court shall order a hearing to determine whether the person is presently suffering from a mental disease or defect *as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another.* A certificate filed under this subsection shall stay the release of the person pending completion of procedures contained in this section.

\*   \*   \*   \*   \*   \*

(e) **Discharge.**—When the director of the facility in which a person is hospitalized pursuant to subsection (d) determines that the person has recovered from his mental disease or defect to such an extent that his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. \* \* \* The court shall order the discharge of the person or, on the motion of the attorney for the Government or on its own motion, shall hold a hearing, conducted pursuant to the provisions of section 4247(d) to determine whether he should be released. If, after the hearing, the court finds by a preponderance of the evidence that the person has recovered from his mental disease or defect to such an extent that—

(1) his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall order that he be immediately discharged; or

(2) his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, *the court shall—*

(A) order that he be conditionally discharged under a prescribed regimen of medical, psychiatric, or psychological care or treatment that has been prepared for him, that has been certified to the court as appropriate by

oner is mentally ill and presents a danger to himself or others, it may order the government to retain custody of the prisoner or it may condition the prisoner's discharge on compliance with a recommended treatment modality. 18 U.S.C. § 4246(e)(2)(B). No such hearing has been held with respect to Holmes. No interest would be served in speculating as to whether Holmes presents a danger to his community at this time. We simply hold that if Holmes is presently functioning adequately in the prison setting and does not present a danger to himself, other inmates, or prison staff, the government may not forcibly administer antipsychotic medications.[17]

Watson, however, clearly has had problems functioning in the prison environment. His history indicates that he has acted impulsively and irrationally both in and out of prison, leading to injury to himself and others. At present, Watson presents no threat to his fellow inmates because he is in solitary confinement. The government argues that it needs to medicate Watson to decrease his manic episodes so that it can return him to the general prison population.

■ We are thus faced with the case of a mentally ill prisoner who cannot function in the general prison population. We do not believe that forcibly medicating a prisoner so that he may be returned to the general prison population violates the prisoner's due process right to be free from unnecessary bodily restraint.

■ Watson argues that he functions adequately in segregated confinement, a less restrictive alternative to drug treatment, and that he should have the right to choose segregation. While we

question the conclusion that such confinement is less restrictive than treatment with lithium, we need not reach that issue. If the government shows that it cannot control a mentally ill prisoner in the general prison population, due process does not require it to provide the least restrictive treatment modality. *See Rennie v. Klein,* 720 F.2d at 269 (reconsideration of *Rennie* in light of *Youngberg* led court to reject "least intrusive means" test.) Rather, we hold that psychotropic drugs may be constitutionally administered to a mentally ill federal prisoner whenever, in the exercise of professional judgment, such an action is deemed necessary to remove that prisoner from seclusion and to prevent the prisoner from endangering himself or others. Once that determination is made, professional judgment also must be exercised in the resulting decision to administer medication. *Rennie,* 720 F.2d at 270. We believe the prison officials have exercised such judgment in this case. We therefore affirm the order of the district court allowing Watson to be forcibly medicated.

## CONCLUSION

We reverse the order allowing the government to forcibly medicate Jackson Holmes and remand his case to the district court to determine whether he is able to function in the general prison population without such treatment. We affirm the order allowing the government to forcibly medicate Gale Watson because at present, prison officials have determined, in the exercise of their professional judgment, that Watson would be unable to function in the general prison setting without medication. That decision is supported by the record before this Court.

the director of the facility in which he is committed, and that has been found by the court to be appropriate; and

(B) *order, as an explicit condition of release, that he comply with the prescribed regiment of medical, psychiatric, or psychological care or treatment.* The court at any time may, after a hearing employing the same criteria, modify or eliminate the regimen of medical, psychiatric, or psychological care or treatment. 18 U.S.C. § 4246(a), (e) (1982) (emphasis added).

17. Although we share the dissent's distaste for the "warehousing" of mentally ill inmates in federal prison medical facilities, we do not believe that Holmes' case presents such a situation. Holmes functions adequately within the hospital setting and performs a job assignment. Moreover, the forced administration of psychotropic medications would result in nothing more than temporary relief of Holmes' symptoms, relief that would cease soon after the medication is withdrawn.

JOHN R. GIBSON, Circuit Judge, dissenting.

The court today, under the guise of recognizing a qualified right for these mentally ill prisoners to refuse treatment, condemns them to nothing more than warehousing. The continuation of their serious mental disorders, which is a necessary consequence of the court's decision, is nothing less than cruel and unusual punishment. In reaching this decision, the court selectively reads not only the Supreme Court precedent, neatly excising and discarding the most significant portion of it, but also the medical evidence before the magistrate and district court. I would affirm the judgment of the district court.

I.

The court reads *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), as concerned only with the assurance of safety for the patient, other inmates, and attending personnel. This is the touchstone of its ultimate decision which is based upon whether the patient can function adequately in a prison setting without presenting the danger to himself, other inmates, or staff. The reasoning of *Youngberg,* however, is far broader.

In *Youngberg,* the Supreme Court pointed to the state's concession of a duty to provide "adequate food, shelter, clothing, and medical care." *Id.* at 315, 102 S.Ct. at 2457–58. Then, after referring to the duty to provide reasonable safety, the court considered when restraint by the state would be deemed proper. The Court stated that:

> [The State] may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training. In this case, therefore, the State is under a duty to provide respondent with such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints. It may well be unreasonable not to provide training when training could significantly reduce the need for restraints or the likelihood of violence.

Respondent thus enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests. Such conditions of confinement would comport fully with the purpose of respondent's commitment.

*Id.* at 324, 102 S.Ct. at 2462.

It is apparent that the court today chooses not to recognize those obligations set out in *Youngberg,* beyond safety considerations. In this case we deal not with physical restraints, nor the training necessary for a permanently retarded individual, as in *Youngberg,* but rather with a different purpose for commitment and confinement, namely treatment of serious psychiatric illness, and medication as its necessary component. In recognizing only safety concerns in its analysis, the court totally ignores the requirement of *Youngberg* that the patient inmate be given such services as required by the purpose of his commitment. *Id.*

The *Youngberg* Court also points to the procedures required and appropriate in this case, namely the exercise of professional judgment in the determination of proper treatment for the individuals. It defined a professional decisionmaker as "a person competent, whether by education, training or experience, to make the particular decision at issue." *Id.* at 323 n. 30, 102 S.Ct. at 2462 n. 30. The Court noted that "[l]ong-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded." *Id.* Further, the Court has recognized that professional decisionmakers should be given a presumption of correctness because they are better qualified to decide the medical issues presented in such cases. *Id.* at 323, 102 S.Ct. at 2462. *See also Parham v. J.R.,* 442 U.S. 584, 607–08, 99 S.Ct. 2493, 2506–07, 61 L.Ed.2d 101 (1979); *Bell v. Wolfish,* 441 U.S. 520, 544, 99 S.Ct. 1861, 1876–77, 60 L.Ed.2d 447 (1979).

## II.

The court also fails to understand the nature of the proceeding in the district court. The statutes in issue in this case were enacted following the decision of the Supreme Court in *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). It is true, as the court points out, that the statute authorizing the proceeding before us, 18 U.S.C. § 4245, is directed at determining the need for treatment rather than to resolving the specific issue of whether there can be forcible administration of psychotropic medication. Yet the decision that there should be treatment necessarily involves considering what treatment is appropriate and required. The hearing in this case involved both issues.

In *United States v. Charters*, 863 F.2d 302 (4th Cir.1988) (en banc), the Fourth Circuit considered a case which involved the very issue before us: forcible medication of a psychiatric patient in a federal correctional institution. Judge Phillips' decision for the *Charters* court sets out the procedure which I believe to be appropriate, and which I believe was followed in this case. This opinion also discusses in detail the reasons supporting this approach. The court states:

It is therefore settled that in appropriate circumstances government may properly commit base-line decisions to "deprive" persons of certain liberty (or property) interests to appropriate professionals exercising their specialized professional judgments rather than to traditional judicial or administrative-type adjudicative processes. This occurs when the conflicting interests—individual and governmental—can only be assessed in those terms, and even when, as is usual, the exercise of professional judgment necessarily involves some interpretation of the disputable "meaning" of clinical "facts."

More specifically, precisely this basic regime—base-line decision committed to medical professionals, subject to judicial review for arbitrariness—has recently been upheld as comporting with due process both by the Supreme Court and this court.

*Id.* at 308 (citations omitted). Judge Phillips then observed, citing *Parham*, that while medical and psychiatric diagnosis is fallible, there is "no reason to suppose that it [would be] more so than would be the comparable diagnosis of a judge or hearing officer." *Id.*

It is true that *Charters* involved an individual found to be mentally incompetent, incompetent to stand trial, and to present a public danger to the officers and interest of the United States. I do not believe, however, that this distinction affects the applicability of the reasoning in *Charters* to this case. Here a hearing has been held to determine whether Holmes and Watson are in need of treatment and, if so, the nature of the treatment. The decision rendered, while not directed to the issue of competency, specifically addressed their mental states and the need for treatment of those conditions. The court in *Charters*, in discussing the need for an additional hearing to determine competency as a part of the procedure desired, pointed to the possibility of conflicting mental conditions. In that case, Charters had been found incompetent to stand trial, but could have been found, under the proposed regime in that case, competent to determine whether he should receive medication. *Id.* at 310. In noting the subtle distinction between these mental states, the court stated that "[t]o suppose that it is a distinction that can be fairly discerned and applied by even the most skilled judges on the basis of an adversarial fact-finding proceeding taxes credulity." *Id.* Further, the court stated: "The resulting threat of wholly inconsistent or highly anomalous adjudications is palpable, and poses high risks to the integrity and trustworthiness of the courts' already perilous involvement—out of necessity—in the adjudication of complex states of mental pathology." *Id.*

Much of the court's discussion today deals with the threat of side effects from medication. Again, *Charters* is instructive by pointing to differing views within the medical profession. In that case, two ami-

ci[1] took opposing positions. The *Charters* court concluded that "[t]hese differences that we are told exist within the scientific community simply serve to emphasize that the side-effects question is simply and unavoidably an element of the ultimate 'best interests' medical decision." *Id.* at 311. Accordingly, the court was "satisfied that as an element of the ultimate 'best interests' medical decision, the side-effects threat can better be assessed and reviewed within the government's proposed regime than by an adversarial adjudicative process." *Id.*

In weighing the respective interests of the patient to make an informed judgment and the government to care for the patient, the *Charters* court stated:

As with the potential for side-effects, we are satisfied that the patient's competence to make an informed judgment in this matter is properly treated as simply another factor in the ultimate medical decision to administer the medication involuntarily.

. . . .

Finally to be weighed in the balance is the governmental interest at stake, and the administrative and fiscal burdens that would be imposed by Charters' proposed regime. It has to be recalled that the government's role here is not that of punitive custodian of a fully competent inmate, but benign custodian of one legally committed to it for medical care and treatment—specifically for psychiatric treatment. In this relationship the government is under a specific statutory duty to attempt to restore mental competency so that the patient may be returned to the free society.

*Id.* at 311–12.

In discussing the professional judgment standard, the *Charters* court noted:

Again, fairly specific guidance has been provided by the Supreme Court. The basic principle is that a legally institutionalized mental patient is entitled to the exercise of "professional judgment"

by those who have the responsibility for making medical decisions that affect his retained liberty interests. This is the process due such a person in this particular circumstance, and its nature dictates both the way in which the decision is to be made by the responsible professionals and how it is to be reviewed if presented to the courts for that purpose.

. . . .

The decision may be based upon accepted medical practices in diagnosis, treatment and prognosis, with the aid of such technical tools and consultative techniques as are appropriate in the profession.

*Id.* at 312 (citations omitted).

With respect to the scope of judicial review of the professional judgment standard, the court recognized that:

The "professional judgment" standard also dictates the scope of judicial review. Under that standard, the question presented by a judicial challenge such as Charters' is not whether the treatment decision was the medically correct or most appropriate one. It is only whether the decision was made by an appropriate professional in the exercise of professional judgment; i.e., not arbitrarily. Due process is denied under this standard only if the decision was reached by such a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."

*Id.* at 313 (quoting *Youngberg*, 457 U.S. at 323, 102 S.Ct. at 2462) (citations omitted).

## III.

I am convinced that the procedures outlined in *Charters* have been followed in this case, and thus the sole question before the magistrate, the district court, and this court on appeal is whether the exercise of professional judgment was arbitrary. This is precisely the issue decided in the orders we are called upon to review. Unfortunately, the court today has approached this

---

**1.** In *Charters,* the American Psychological Association supported the patient's position, while the American Psychiatric Association supported the position held by the government. 863 F.2d at 311.

case in a far different manner. It either decides, or remands to the district court to decide, the question involved rather than having the court determine whether the exercise of professional judgment was arbitrary. Further, the court has given substantial weight to the written opinions of the various doctors, but has, for the most part, ignored the testimony at the hearing. I believe that when the entire record is considered, it becomes apparent that professional judgment has been properly exercised in this case, and that the record fully supports a decision that the medical judgment to force medication was not arbitrary.

As the court today affirms as to Watson, a result with which I concur, it is necessary only to examine the record with respect to Holmes. The evidence demonstrates that Holmes has a lessened capacity for making his own decisions. The physicians' testimonies bear this out. Dr. Butts states that Holmes' fear of side effects is not rational, but, nevertheless, is integrated in his delusional system. (Tr. 38). Dr. Snow confirms that Holmes' fear of side effects from the medication, and accordingly his desire to refuse medication, is a part of his delusional belief. (Tr. 61).

The court today places great emphasis on the fact that Holmes was functioning adequately in the structured environment of an institution. There is, however, much evidence to the contrary. Dr. Butts described two altercations involving Holmes, one that occurred shortly after Holmes had arrived at the facility in which Holmes had sustained injuries, (Tr. 39), and another that took place when Holmes was moved from a very controlled ward to a more open one. (Tr. 39–41). Further, in his report in the record, Dr. Conroy, a psychologist, stated that Holmes, when in confrontational situations, becomes extremely defensive, that a stressful or pressured situation will break through his fragile defenses, and that he then becomes loose, rambling, tangential, and very illogical. (App. at 11). As his behavior escalates, Holmes has difficulty controlling his verbalizations or slowing his speech, and delusions of a grandiose or persecutory nature become evident. (App. at 11). Dr. Conroy also referred to

Holmes' increasing hostility during one of their interviews.

I believe that the proper standard, as I have said, is that the decisions of medical professionals concerning appropriate medical treatment of a patient with a serious and chronic illness, such as Holmes, should be subject to judicial review only for arbitrariness. The testimony before the magistrate clearly established that the decision in this case was not arbitrary. Dr. Conroy, a psychologist, recommended medications and stated that clinically the treatment would go nowhere unless psychotropic medication was used and that, without medication, Holmes would simply be warehoused the rest of his life. (Tr. 20). Conroy also stated that the majority of persons forcibly medicated have a fear of medication, but that medication is, nevertheless, helpful in allaying their anxieties, and that the patients improve. (Tr. 20). Finally, she concluded that treatment less intrusive than psychotropic medicine would not be effective based upon Holmes' history prior to and during his treatment at the Medical Center. (Tr. 21).

Dr. Butts, a psychiatrist, also stated that other treatment modalities would not be effective without medication and a highly structured environment. Butts observed that Holmes' prognosis is very gloomy, and while he has benefited from the controlled environment without the addition of appropriate medication, he will never have the opportunity to be well. Further, Butts noted that the fear of medication is part of Holmes' delusional system and a feature of the disease process itself. (Tr. 38). Butts concluded that the administering act, if properly done, would not be as traumatic as Holmes' dread of it and, would give Holmes optimum opportunity for relief of his symptoms. (Tr. 44–45).

Dr. Snow, a psychiatrist who testified on Holmes' behalf, was very clear in her report that medication was desirable. She stated specifically that it would be worthwhile for him to take the medication. (Tr. 64–65). Snow's only reason for not recommending medication is that Holmes' fear is firmly rooted in his mind as part of his

delusional belief. She stated that she would try to obtain his willingness or cooperation to take the medication, and thought it would do him a lot of good, and make him feel better. (Tr. 61). Snow also noted that the medication decision could exacerbate his condition. (Tr. 61). The physician agreed that this created a catch–22 situation, in that Holmes probably would not get better unless he was medicated, but could not be medicated because he might get worse. (Tr. 61–62). Dr. Snow stated that it was possible to work with such an individual. She added, however, that if she were unable to change Holmes' delusional system without medication, and medication was not used, it would be unfortunate because he would be limiting his own freedom and ability to live comfortably in the community. (Tr. 62). She noted simply that someone with his delusions and distrust of authority would have nothing but interpersonal problems within the community. (Tr. 62). Snow concluded that Holmes' fear of medication was greatly exaggerated and that the patient stresses only the detriment or risk of the medication and does not recognize that a number of people have been helped by it. (Tr. 64–65).

Dr. Burstin, a clinical psychologist, also testified on behalf of Holmes. He admitted that the issue of medication was more properly decided by a psychiatrist. Accordingly, Burstin stated that he would refer Holmes to a psychiatrist to determine if medication was the appropriate treatment. (Tr. 72–74). If the psychiatrist gave an opinion that the medication would make Holmes more treatable, Burstin opined that he would not necessarily disagree, but simply noted that this issue would not be in his province. (Tr. 74).

The record also contains considerable discussion of side effects of the medication, particularly from Dr. Butts and Dr. Snow. Their testimony is that the serious side effects occur in only a small percentage of the cases. (Tr. 45, 60).

I believe that the record before the magistrate and district court is sufficient to support determinations that Watson and Holmes are in need of medical treatment and that the medical decisions pertaining to them were not arbitrary. There was substantial evidence that forced medication is desirable from the standpoint of the overall treatment and well-being of Holmes, and that his delusions are part of the disease process and are such to prevent him from making a fully informed choice. The record before the magistrate was such that we cannot conclude that the medical decision made by the hospital authorities was arbitrary or contrary to accepted medical judgment.

I would affirm the judgment of the district court.

