[No. 54045-4. En Banc. July 7, 1988.]

WALTER HARPER, *Appellant,* v. THE STATE OF WASHINGTON, *Respondent.*

*Brian Reed Phillips,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Glenn L. Harvey, Assistant,* for respondent.

*John H. Hertog, Jr.,* and *Neil R. Sarles* on behalf of the American Civil Liberties Union; *James F. Pultz* and *Robert A. Stalker, Jr.,* on behalf of Evergreen Legal Services and Institutional Legal Services; *William Salen* and *George Yeannakis* on behalf of Seattle–King County Public Defender Association, amici curiae for appellant.

BRACHTENBACH, J.—Is a prisoner entitled to a judicial hearing before antipsychotic drugs can be administered against his will? The trial court answered no. We accepted direct review and reverse.

The facts are undisputed. Convicted of robbery, appellant Harper was sentenced in 1976 to the Washington State Penitentiary in Walla Walla. Between 1976 and 1980, Harper was housed primarily in the mental health unit there, where he voluntarily underwent antipsychotic drug therapy. Harper was transferred periodically to Eastern State Hospital for evaluation and treatment.

Harper was paroled in 1980 on condition that he participate in psychiatric treatment. He spent some of his parole time in the psychiatric ward at Harborview Medical Center in Seattle, and part at Western State Hospital, pursuant to a civil commitment order. In December 1981, Harper's

parole was revoked after he assaulted two nurses at Saint Cabrini Hospital in Seattle.

Following his return to prison, Harper was sent to the Special Offenders Center (SOC) at Monroe in January 1982. The SOC is a 144–bed correctional institution administered by the Department of Corrections. The SOC was established to provide diagnosis and treatment of convicted felons having serious behavioral or mental disorders. Approximately 27 inmates at the SOC receive involuntary medication.

While at the SOC, Harper voluntarily submitted to treatment, including administration of antipsychotic medications. In November 1982, Harper refused to continue taking the prescribed antipsychotic drugs. At Harper's treating physician's request, a hearing committee was convened to determine whether medication should be administered to Harper against his will. Harper does not dispute that the hearing took place in accord with SOC policy. The committee found that, as a result of mental disease or disorder, Harper was a danger to others. The committee authorized Harper's involuntary medication. Harper appealed the decision to the Monroe reformatory superintendent, who upheld the committee's decision.

Between November 1982 and June 1985, Harper was involuntarily medicated with a variety of antipsychotic drugs. During this period, Harper's treatment was reviewed by the committee approximately every 2 weeks. Each time, the committee decided to continue the medications, although the dosages or drugs were sometimes changed.

In February 1985, Harper filed this action for injunctive and monetary relief against the State.[1] for its administration of antipsychotic medications to him pursuant to SOC's involuntary medication policy. Harper was not present when the case was heard in superior court. Following trial,

---

[1]Harper brought his claim pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1983. At trial, he alleged constitutional violations along with tort claims for assault, battery and outrage. See Complaint, at 6–7, Clerk's Papers, at 122–23.

the court dismissed Harper's complaint. Harper appealed directly to this court.

Harper does not dispute that the State followed the SOC involuntary medication policy. Instead, he contends that the policy fails to provide adequate due process protection because it allows the State to decide to administer antipsychotic medication against his will without a judicial hearing.[2]

## I

■ Initially, we agree with the trial court's conclusion that Harper had a protected liberty interest in refusing antipsychotic drug treatment.[3] See conclusion of law 1, Clerk's Papers, at 18. We have recognized that competent adults have a right to determine what shall be done to their bodies. *In re Schuoler,* 106 Wn.2d 500, 506, 723 P.2d 1103 (1986); *In re Ingram,* 102 Wn.2d 827, 836, 689 P.2d 1363 (1984); *In re Colyer,* 99 Wn.2d 114, 119, 660 P.2d 738 (1983). We also have specifically recognized a right to refuse electroconvulsive therapy. *In re Schuoler, supra.*

In *Schuoler,* the plaintiff was involuntarily committed because of severe mental problems. At her commitment hearing, her treating psychiatrist asked the court to authorize electroconvulsive therapy (ECT), which the plaintiff had refused to undergo. Following a separate hearing on the issue, the trial court authorized ECT. This court reversed, holding that "a person involuntarily committed

---

[2]Because we decide this case on due process grounds, we do not address Harper's equal protection or free speech claims.

[3]Antipsychotic drugs are also referred to as psychotropic drugs, neuroleptics, and major tranquilizers. *See* Kemna, *Current Status of Institutionalized Mental Health Patients' Right To Refuse Psychotropic Drugs,* 6 J. Legal Med. 107, 109 (1985); *The Pharmacological Basis of Therapeutics* 152, 172–74 (A. Gilman, L. Goodman, A. Gilman ed. 6th ed. 1980) (*Goodman & Gilman's*). This category of drugs commonly includes phenothiazines (*e.g.,* Thorazine, Vesprin, Serentil, Prolixin), thioxanthenes (*e.g.,* Navane) and other heterocyclic compounds (*e.g.,* Haldol). *Goodman & Gilman's,* at 391–408. The drugs administered to Harper included Trialafon, Haldol, Prolixin, Taractan, Loxitane, Mellaril, and Navane. See finding of fact 9, Clerk's Papers, at 16.

Our holding here applies specifically to this category of drugs.

due to a mental disorder retains a fundamental liberty interest in refusing ECT." *Schuoler,* at 507. We noted that the right to refuse ECT was especially important because ECT is a highly intrusive medical procedure with well documented adverse side effects such as memory loss and impairment of learning ability. *See Schuoler,* at 506.

Like ECT, antipsychotic drug therapy is a highly intrusive form of medical treatment. *See Guardianship of Roe,* 383 Mass. 415, 436–37, 421 N.E.2d 40 (1981). Antipsychotic drugs are by intention mind altering; they are meant to act upon the thought processes. *Riese v. St. Mary's Hosp. & Med. Ctr.,* ___ Cal. App. 3d ___, 243 Cal. Rptr. 241 (1987); *Guardianship of Roe, supra.*

The benefits of antipsychotic drug treatment to acutely ill patients are well documented. *See The Pharmacological Basis of Therapeutics* 152, 172–74 (A. Gilman, L. Goodman, A. Gilman 6th ed. 1980) (Goodman & Gilman's). Also documented, however, are the adverse side effects of antipsychotic drug treatment. Less serious, reversible side effects include dystonia, a severe involuntary spasm of the upper body, throat, tongue or eyes; akathesia, the inability to remain still, restlessness and agitation; and pseudo–Parkinsonism, manifested by a mask–like face, drooling, muscle rigidity, stiffness, tremors and a shuffling gait.[4] See finding of fact 9, Clerk's Papers, at 11; Kemna, *Current Status of Institutionalized Mental Health Patients' Right To Refuse Psychotropic Drugs,* 6 J. Legal Med. 107, 111–13 (1985); Goodman & Gilman's, at 164–72. Although common, these effects can be controlled by administration of other drugs, adjustment of the dosage, or termination of the therapy. Kemna, at 112; Goodman & Gilman's, at 164–72. Severe and potentially permanent is tardive dyskinesia, an irreversible neurological disorder characterized by involuntary, uncontrollable movements of the tongue, mouth or

---

[4]The record shows that Harper exhibited symptoms of dystonia and akathesia and was treated with the side effect medication, Cogentin. He did not show signs of tardive dyskinesia. See finding of fact 10, Clerk's Papers, at 12.

jaw. Fingers, arms and legs may also be affected. Tardive dyskinesia can be masked by the drug causing the condition, and can manifest itself years after treatment has occurred. See finding of fact 9, Clerk's Papers, at 11; Kemna, *supra* at 113.

We find that antipsychotic drug treatment is no less intrusive than ECT. Therefore, we recognize a fundamental liberty interest in refusing antipsychotic drug treatment as well. Other courts have reached similar conclusions. *See, e.g., Riese v. St. Mary's Hosp. & Med. Ctr., supra; People v. Medina,* 705 P.2d 961, 967 (Colo. 1985); *Rogers v. Commissioner of Dep't of Mental Health,* 390 Mass. 489, 458 N.E.2d 308 (1983); *Guardianship of Roe, supra* at 436–37 ("few legitimate medical procedures . . . are more intrusive than the forcible injection of antipsychotic medication. . . . Because of both the profound effect that these drugs have on the thought processes . . . and the well–established likelihood of severe and irreversible adverse side effects . . . we treat these drugs in the same manner we would treat psychosurgery or electroconvulsive therapy").

## II

The State argues that Harper's liberty interest in refusing treatment was adequately protected by the existing SOC involuntary medication policy. The trial court agreed. See conclusion of law 3, Clerk's Papers, at 66.

The SOC involuntary medication policy provides for a hearing prior to the administration of antipsychotic drugs. See generally finding of fact 3, Clerk's Papers, at 8–11. Hearings are held before a committee composed of a psychiatrist, a psychologist, and the SOC associate superintendent. Finding of fact 3(b), Clerk's Papers, at 9. A prisoner can be medicated against his will if a majority[5] of the committee finds that he suffers from a mental disorder gravely disabling him or causing him to present a likelihood

---

[5]If medication is approved, the psychiatrist must vote with the majority. Finding of fact 3(b), Clerk's Papers, at 9.

of serious harm to himself or others. Finding of fact 3(a), Clerk's Papers, at 9.

The policy grants the following procedural protections: 24–hour notice of the SOC's intent to convene an involuntary medication hearing; the right to be present and to present evidence, including witnesses; the right to cross–examine the staff witnesses; the assistance of a lay adviser; the right to appeal the decision to the SOC superintendent; and the right to periodic reviews subsequent to the initial hearing. Finding of fact 3, Clerk's Papers, at 8–11.

The policy does not allow representation by counsel. Finding of fact 7, Clerk's Papers, at 14. The rules of evidence do not apply. The policy does not provide for review of the committee's decision, except by personal restraint petition or extraordinary writ to the superior court. See conclusion of law 2, Clerk's Papers, at 18. Also, although a prisoner's treating physician who has recommended the involuntary medication cannot sit on the initial committee, he can sit on subsequent panels reviewing continued treatment if he is at that time no longer the treating physician, creating a conflict of interest the policy apparently meant to avoid. See findings of fact 6, 7, Clerk's Papers, at 13–15.

Prior to an involuntary medication hearing, committee members consult with the SOC staff outside the presence of the prisoner to determine whether policy requirements have been met and what the staff's position will be at the hearing. Finding of fact 7, Clerk's Papers, at 14. Staff members then summarize their positions for the hearing committee and briefly present their reasons as to why the prisoner is dangerous and why his condition is a product of a mental disorder. Finding of fact 7, Clerk's Papers, at 14. The prisoner is brought into the hearing, which then proceeds in accordance with policy. Finding of fact 7, Clerk's Papers, at 14. The prisoner is excused during the committee's deliberations, after which the prisoner is brought back in and informed of the committee's decision. Finding of fact 7, Clerk's Papers, at 14. The committee later dictates its

final decision and findings. Finding of fact 7, Clerk's Papers, at 14–15.

The State contends that no judicial hearing is required, urging that a decision based on professional judgment adequately protects prisoners' rights to refuse antipsychotic drug treatment.

The State relies on *Vitek v. Jones,* 445 U.S. 480, 495, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980); *Youngberg v. Romeo,* 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982); and *Large v. Superior Court,* 148 Ariz. 229, 714 P.2d 399 (1986). The State points out that in *Vitek,* where the Court held that due process entitled a prisoner to a hearing before transfer to a state mental hospital for a mandatory behavior modification treatment, the Court required only an "independent decisionmaker", not a judge. *See Vitek,* at 495. The State further points out that in *Youngberg* the Court, noting that judges are not necessarily more qualified than appropriate professionals, found that a "professional decisionmaker" adequately protects the due process rights of mentally disabled persons. *Youngberg,* at 323. Similarly, in *Large v. Superior Court, supra* at 239, the Arizona Supreme Court held that antipsychotic drugs could be administered to a prisoner against his will pursuant to a treatment plan formulated by a professional in compliance with statutory or administrative requirements. The State concludes that the SOC policy provides an independent professional decisionmaker and thus affords prisoners ample due process. We disagree.

The Court in *Vitek* was concerned with the "stigmatizing consequences" of a transfer to a mental health hospital for involuntary psychiatric treatment consisting of a behavior modification program. *See Vitek,* at 494. Here, we are concerned with the administration of mind altering drugs that have adverse, potentially permanent, side effects. We believe that the highly intrusive nature of antipsychotic drug treatment warrants greater protections than those

necessary to protect the interests at issue in · *Vitek*.[6] In *Youngberg,* the issue was whether a severely retarded man had received proper treatment in a state facility. *Youngberg,* at 309. No allegation that a hearing was required before any particular treatment was before the Court. *Youngberg,* at 322. Moreover, while the court in *Large* did not explicitly require a judicial hearing prior to treatment, the prisoner there had already received a full statutory judicial hearing during which a judge had ruled on the necessity of treatment prior to his transfer to the prison mental health facility where treatment took place. *Large,* at 231 n.2.

 We conclude that a judicial hearing is required before the State may administer antipsychotic drugs to a prisoner against his will. As noted by the Court in *Vitek v. Jones, supra* at 495, "[i]t is precisely '[t]he subtleties and nuances of psychiatric diagnoses' that justify the requirement of adversary hearings."

The State next argues that extending full due process hearing rights to prisoners amounts to judicially extending the involuntary commitment statutes to prisoners. The State concludes that the considerations behind the civil commitment statutes are inapplicable to the prison context where individuals are committed only after conviction of a crime, having received extensive due process protections, and then only for a fixed maximum period of time.

The State's argument is unpersuasive. In *Schuoler,* we held that the statutory protection afforded by the involuntary treatment act was inadequate to protect the independently existing constitutional right to refuse ECT. *See In re Schuoler,* 106 Wn.2d 500, 509, 723 P.2d 1103 (1986). Here, we extend our analysis in *Schuoler* to recognize a right to

---

[6]In a case similar to *Vitek,* we held on equal protection grounds that a prisoner was entitled to a judicial hearing before he could be transferred against his will from prison to a separately administered mental health facility, to be given psychiatric treatment that included antipsychotic drugs. *See Harmon v. McNutt,* 91 Wn.2d 126, 587 P.2d 537 (1978).

refuse antipsychotic drug treatment. We do so on constitutional rather than on statutory grounds. Moreover, we conclude that the constitutional liberty interest in refusing ECT and antipsychotic drug treatment survives criminal conviction and incarceration just as it survives civil involuntary commitment. *See Large v. Superior Court, supra* at 236.[7]

Finally, the due process protection given to a criminal defendant before sentencing and incarceration protects rights distinct from those at issue here. Harper has never been adjudged insane, nor was he incarcerated for his mental condition.[8] As stated by the Court in *Vitek v. Jones, supra* at 493–94:

> A criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from confinement for the term of his sentence, but they do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment without affording him additional due process protections.

We conclude that the due process requirements enunciated in *Schuoler* apply here as well.

At the threshold, we hold that a judicial hearing must be held to determine whether the State can treat a prisoner with antipsychotic drugs against his will. A court may order

---

[7]The SOC Involuntary Medication Policy defines "gravely disabled" and "presents a likelihood of serious harm to himself or others" identically to the statutory definitions used in RCW 71.05, the involuntary commitment statute.

The State's promulgation of the SOC policy articulating a standard for involuntary medication may have created a protected liberty interest in itself. *See, e.g., Roberts v. Spalding,* 783 F.2d 867, 870 (9th Cir. 1986) (liberty interest in state administrative regulation may be created where a regulation places substantive limits on the exercise of official discretion); *Vitek v. Jones, supra* at 488–89 (once a state has granted prisoners liberty interests, due process protections are necessary to insure that the state–created right is not arbitrarily abrogated).

[8]The State's assertion that prisoners are released after a fixed maximum time period raises the possibility that Harper's prison sentence could end while the SOC policy dictates that his involuntary medication continue. Before the State could continue medicating him, it would have to follow civil commitment proceedings, if not the *Schuoler* requirements, should he refuse.

imposition of antipsychotic drug treatment upon a nonconsenting prisoner when the State proves (1) a compelling state interest to administer antipsychotic drugs, and (2) the administration of the drugs is both necessary and effective for furthering that interest.[9] *Schuoler,* at 508.

In *Schuoler,* we listed four nonexclusive criteria sufficiently compelling to override a patient's objection to medical treatment: (1) preservation of life; (2) protection of third parties' interests; (3) prevention of suicide; and (4) maintenance of the ethical integrity of the medical profession. *Schuoler,* at 508. If the court determines that there exists a compelling state interest in administering antipsychotic drugs against a prisoner's will, then the court must determine whether such treatment is both necessary and effective. *See Schuoler,* at 508–09. The court should consider medical prognosis with and without the treatment, as well as alternative treatments. *Schuoler,* at 509.

> A court asked to order [antipsychotic drug treatment] for a nonconsenting patient must therefore consider the patient's desires before entering an order. The court should consider previous and current statements of the patient, religious and moral values of the patient regarding medical treatment and [antipsychotic drug treatment], and views of individuals that might influence the patient's decision. If the patient appears unable to understand fully the nature of the . . . hearing—as severely mentally ill patients often are—the court should make a "substituted judgment" for the patient that is analogous to the medical treatment decision for an incompetent person. *See In re Ingram,* [102 Wn.2d 827] at 838–42 [689 P.2d 1363 (1984)].

---

[9]We decline to apply a reasonable relation analysis to the medication policy at issue here as urged by the State for the first time in its reply to the Brief of Amicus Curiae.

The uniquely intrusive nature of antipsychotic drug treatment is distinguishable from the First Amendment interests involved in the cases cited by the State. *See Turner v. Safley,* ___ U.S. ___, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987) (inmate mail); *O'Lone v. Estate of Shabazz,* ___ U.S. ___, 96 L. Ed. 2d 282, 107 S. Ct. 2400 (1987) (religious practices). We decline to follow those cases in this context.

*Schuoler,* at 507. Thus, the court must set forth findings on (1) the State's interest in the treatment; (2) the necessity and effectiveness of the treatment; and (3) the desires of the patient or a substituted judgment by the court. *Schuoler,* at 507–08.

The prisoner

> must be present at this hearing and must be represented by counsel. Included in the requirement of a judicial hearing are the rights to present evidence, to cross–examine witnesses, to be proceeded against under the rules of evidence, to remain silent, and to view and copy all petitions and reports in the court file.

*Schuoler,* at 510. A prisoner must be given reasonable notice and time to prepare for the hearing. The State must justify the court's authorization of antipsychotic drug treatment against a prisoner's will by "'clear, cogent, and convincing' evidence." *See Schuoler,* at 510. Finally,

> "[i]f the court grants the order for involuntary medication, it may place such time limits and conditions on the administration of the medication as are appropriate under the circumstances of the case."

*Schuoler,* at 511 (quoting *People v. Medina,* 705 P.2d 961, 974 (Colo. 1985)).

## III

The State's final argument is that Harper's suit must be dismissed because he has proved no violation of a "clearly established" constitutional right so as to overcome the State's qualified immunity under 42 U.S.C. § 1983. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).

■ Under 42 U.S.C. § 1983, state officials are immune unless the official

> knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [person] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury . . .

*Wood v. Strickland,* 420 U.S. 308, 322, 43 L. Ed. 2d 214, 95 S. Ct. 992 (1975); *Hocker v. Woody,* 95 Wn.2d 822, 825, 631 P.2d 372 (1981). The official must have an objectively reasonable belief that his or her conduct was constitutional. *Hocker,* at 825; *Wood,* at 321. Official conduct is per se unreasonable if contrary to clearly established constitutional rights. *Hocker,* at 825; *Wood,* at 322.

Although we have concluded here that the State's actions violated Harper's constitutional rights, courts have uniformly refused to award damages when the constitutional right allegedly violated was not clearly established at the time of the conduct. *Hocker,* at 826. In these cases, a defendant is said to have acted reasonably absent a showing of malicious intent. *Hocker,* at 826.

At the time of the State's actions at issue in this case, the law regarding prisoner's rights to refuse antipsychotic drug treatment was not clearly established. Neither state nor federal case law directly addressed the issue presented here, and no statutory violation occurred. Moreover, the Secretary of Corrections and his staff promulgated the SOC involuntary medication policy in response to the *Harmon v. McNutt,* 91 Wn.2d 126, 587 P.2d 537 (1978) and *Vitek* decisions, after consultation with the Attorney General. See finding of fact 3, Clerk's Papers, at 8–9. While reliance on the advice of counsel is not an absolute defense, it is a factor to be considered on the issue of good faith. *Hocker,* at 827. The record indicates that the State acted reasonably in formulating the policy challenged here, and in following that policy. We conclude that there was no disregard of a clearly established constitutional right and that the State acted reasonably, not maliciously, and in good faith. *See Hocker,* at 827.

We note that notwithstanding the State's immunity under § 1983, Harper also seeks injunctive and declaratory relief. The trial court also did not reach Harper's state law

claims. Therefore, this case is reversed and remanded for proceedings consistent with this opinion.

PEARSON, C.J., and UTTER, DOLLIVER, DORE, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.