[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a petition for writ of habeas corpus in which the petitioner claims that his confinement is illegal: (1) in that he has been subjected to involuntary psychiatric treatment without attendant due process protections in violation of the due process clause of theFourteenth Amendment to the United States Constitution, and (2) in that he has been subjected to involuntary psychiatric treatment without a judicial determination of the necessity of such treatment which is afforded committed persons pursuant to Conn. Gen. Stat. Section 17-176 et. seq. in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution.
I. STIPULATION OF FACTS
The Court finds the following facts based on a joint stipulation of facts dated September 23, 1988 entered into between the parties as follows:
1. Petitioner is incarcerated at CCI-Somers and is in the custody of the Commissioner of Correction. His maximum discharge date is October 7, 1989.
2. Petitioner has ongoing mental health problems of a serious nature, which may well require emergency intervention by the mental health staff on future occasions at CCI-Somers.
3. Those mental health problems and respondent's responses to them are documented in Mr. Cliff's psychiatric file and medical file.
4. There is a possibility that emergency interventions concerning petitioner by the mental health staff at CCI-Somers will occur before petitioner's discharge date in October of 1989.
5. There is a possibility that these future interventions will result in involuntary administration of antipsychotic and/or psychotropic drugs to petitioner. Petitioner does not CT Page 2090 wish such involuntary administration of antipsychotic and/or psychotropic drugs to occur, now or in the future.
6. Respondent's present policy, effective August 30, 1988, allows administration of such drugs to inmates like Mr. Cliff, if a prescribing psychiatrist determines that an inmate is an imminent danger to himself or others or is so greatly disturbed that he cannot exercise adequate judgment to insure his safety within a maximum security environment. Under these conditions, short serum life duration medication may be administered for up to ninety-six hours. The prescribing psychiatrist will be responsible to ensure that the minimum amount of force necessary is used.
7. If in the prescribing psychiatrist's judgment, involuntary medication is necessary for a larger duration than ninety-six hours, the Mental Health Director, or, in his absence, the Counselor Supervisor will be notified and will convene a panel. The panel will be chaired by the Mental Health Director and will consist of the prescribing psychiatrist, at least one other psychiatrist and other appropriate staff. The panel will review the prescribing psychiatrist's findings, interview the inmate and arrive at at decision. Only a consensus of the panel will justify additional involuntary medication.
8. Petitioner may also, before he is discharged from CCI-Somers, agree voluntarily to take certain prescribed antipsychotic or psychotropic drugs.
9. Petitioner has sometimes accepted and sometimes rejected such antipsychotic and psychotropic drugs in the past at CCI-Somers when they were offered.
10. Petitioner has been committed to Whiting Forensic Institute only once during his incarceration at CCI-Somers. On April 1, 1988, he was transferred from CCI-Somers to Whiting and signed voluntary commitment papers on or about April 15, 1988. Mr. Cliff was discharged to CCI-Somers from Whiting on May 20, 1988.
11. Mr. Cliff is presently not taking any antipsychotic or psychotropic medication and has not taken any such medication on a voluntary or involuntary basis since early August of this year.
II. ADDITIONAL FACTS
The Court finds the following additional facts from the evidence presented. CT Page 2091
 Petitioner noted in a bizarre and irrational Commissioner of Correction, on October 6, 1980, for a five to ten year sentence as a result of his conviction for first degree larceny, possession of rifles in a motor vehicle and second degree criminal trespass.
 Petitioner acted in a bizarre and irrational manner throughout most of the trial and was psychotic at trial as defined by Petitioner's own witnesses.
 Petitioner had been treated with psychotropic drugs before trial, both voluntarily and involuntarily, and could require involuntary administration of psychotropics after trial.
 Petitioner received involuntary medication only four times during his incarceration at CCI, Somers, from October 6, 1980 until September 26, 1988.
 The length of such involuntary administrations varied from two to thirty days, with the mean length of administration six days.
 Of the 1400 individuals at CCI, Somers at the time of the habeas corpus trial, 30 were on some from of antipsychotic medication. Since CCI, Somers is the only State Correctional facility allowed to administer these medications, inmates with mental health problems at other institutions are channeled to the Mental Health Unit (hereinafter referred to as MHU).
 There were either one or no individuals incarcerated at Somers on involuntary psychotropic medication on the second date of the habeas corpus trial.
 Petitioner has a borderline personality disorder and an antisocial personality disorder. He can become psychotic and requires hospitalization for the duration of certain severe psychotic episodes with appropriate antipsychotic medication.
 Petitioner would be sent to Whiting if his condition warranted. CT Page 2092
 Forced medication is not given to Mr. Cliff when he's psychotic but not dangerous.
 Petitioner responds very quickly and well to medication. Medication is not used for behavorial control at CCI, Somers.
 Mr. Cliff was not taking antipsychotic medications at the time of trial. He had not taken them since early August of 1988.
 Petitioner was given psychotropic medications while at Whiting Forensic Institute in 1988.
 Antipsychotic calm the patient and make him communicative and more rational. Mr. Cliff has been remarkably free of side effects from such medications.
 The utility of these medications is not enhanced if taken voluntarily.
 When Mr. Cliff is in the throes of a violent psychotic episode it requires five or six officers to transport him to the MHU. He is often assaultive, incoherent, inappropriate in his behavior or non-communicative.
 Mr. Cliff can get hurt when he becomes a danger to himself or others or is gravely disabled.
 The treatment of a borderline personality disorder is extremely difficult, if not impossible. Antipsychotics would not be forced on Petitioner to deal with that disorder.
 Efforts to place Petitioner in the CCI, Somers, Transitional Treatment Unit have not been successful as a result of Mr. Cliff's borderline personality disorder. He would be given another chance at the Transitional Treatment Unit if he voluntarily began taking antipsychotics.
 No institution in the State of Connecticut is devoted to the treatment of borderline personality disorders. Such treatment cannot be separated from Petitioner's anti-social personality disorder. Counseling is impossible for an individual such as Mr. Cliff, who doesn't want to be counseled. CT Page 2093
 Petitioner was first seen by the Mental Hygiene Unit at CCI, Somers on or about September 14, 1982.
 Dr. Walter Venters, a clinical psychologist, was the Director of the MHU at the time of the habeas corpus trial.
 The MHU is an out-patient clinic, not a mental hospital. Treatment at the MHU comports with professional standards of mental health treatment.
 The MHU provides inmates with involuntary medications for no more than two weeks. Prescriptions are never automatically renewed. Inmates rarely continue on involuntary medications for more than a two week period.
 Psychiatrists in the MHU sometimes authorized psychotropics without examining the patient.
 When petitioner was given forced medication at the MHU he had been suicidal and homicidal and more psychotic than his behavior at trial.
 Petitioner could ordinarily be adequately treated at the MHU. If not, he would be sent to Whiting.
 The four psychiatrists at the MHU are on duty six hours each day they work. A psychiatrist is always on-call at CCI, Somers.
III. CURRENT POLICIES AND PROCEDURES REGARDING INVOLUNTARY PSYCHOTROPIC AND ANTIPSYCHOTIC MEDICATIONS
The present policy regarding the involuntary administering of psychotropic and antipsychotic medication was instituted by Dr. Venters on August 30, 1988, less than one month before this habeas corpus trial commenced. That policy is as follows:
3) Involuntary Medication:
 Psychotropic and Antipsychotic medication shall be administered to an inmate against his wishes only in a mental health emergency. A mental health emergency is defined as a situation in which the prescribing psychiatrist has determined that the CT Page 2094 inmate is in imminent danger to himself or others or is so gravely disabled that he can not exercise adequate judgment to insure his safety within a maximum security environment. Under these conditions short serum life duration medication may be administered for up to 96 hours. After the determination is made that medication will be administered involuntarily, it will be the responsibility of the prescribing psychiatrist to insure that the minimum amount of force necessary is used.
 If in the prescribing psychiatrist's judgment, it is necessary to continue to involuntarily medicate beyond 96 hours; the psychiatrist shall notify the M.H. Director, or in his absence, the Counselor Supervisor who will immediately convene a panel. The panel shall be chaired by the director and consist of the prescribing psychiatrist, at least one other psychiatrist and other staff as deemed appropriate. The panel shall review the prescribing psychiatrist's findings, interview the inmate and arrive at a decision. Only a consensus will justify additional involuntary medication.
Involuntary medication is ordinarily given to one or two inmates a month throughout the entire population of CCI, Somers.
Inmates at CCI, Somers, on forced medications are reviewed by a psychiatrist on a daily basis during the week. They are only kept on such medications for a short while.
Involuntary medication is used at CCI, Somers as an absolute last resort.
IV. THE MOOTNESS ISSUE
The respondent makes the following argument in claiming that the petitioner's claim is moot due to his discharge from confinement at Somers State Prison:
 Plaintiff makes two basic claims in his March 29, 1989, brief. He argues that he has a liberty interest in refusing drug treatment and suggests that he is being denied equal protection since he is denied "rights" pursuant to Conn. Gen. Stat. Sec. 17-176 et. seq. He concludes with a request that this Court declare his confinement illegal as a result of alleged constitutional and statutory CT Page 2095 violations.
 Respondent is well aware and appreciative of this Court's patience in this matter. Respondent is also well aware of the Court's order, dated July 21, 1989, which appears to prohibit any claim of mootness in this case. With all due respect to this Court, however, Respondent feels it necessary to emphasize several recent developments and the related law concerning these events.[3]
 Petitioner was discharged from CCI, Somers, on February 8, 1990, and was immediately committed to Whiting after spending the period from October 25, 1989 — February 8, 1990 in Whiting. Petitioner remains at Whiting on an involuntary commitment.
 Mr. Cliff's present status at Whiting, therefore, makes this entire litigation moot since he is no longer committed to the Department of Correction and is an involuntarily committed mental patient. Petitioner's present status makes it impossible for the Respondent to forcibly medicate him and eviscerates his equal protection claim. As such, this petition should be summarily dismissed.
 Additionally, the cases of Flaherty v. Warden, 155 Conn. 36, 39-40 (1967), Dukuly v. Warden, 34 Conn. Sup. 88 (1977) and Sanchez v. Warden, 214 Conn. 23, 32-35 (1990), all concern the issue of whether violations of constitutional rights may constitute illegal confinement and justify the granting of habeas corpus writs. See Conn. Gen. Stat. Sec. 52-466.
 Despite the diversity of views expressed in those cases, it cannot be disputed that confinement in a correctional institution is an obvious and necessary prerequisite to the issuance of this type of writ. Respondent submits that Petitioner's discharge and present status mean that this Court has no jurisdiction to grant any relief to Petitioner.[4] Any prospective relief is barred by Conn. Gen. Stat. Sec. 52-466, the cases noted above and City of Los Angeles v. Lyons, 461 U.S.
95, 103 S.Ct. 1660 (1983).[5]
 Dismissing this petition as moot, then comports with the facts of the case and with the CT Page 2096 realities of a habeas corpus action. Moreover, such an action would be an exercise in judicial restraint since "[C]onstitutional issues need not be considered unless absolutely necessary to the decision of a case." State v. Perrucio, 192 Conn. 154, 166 n. 6 (1984); Bruno v. Civil Service Commission of Bridgeport, 192 Conn. 335, 352 (1984).
The Court is not persuaded by that argument.
First, the record is clear that the petitioner did not agree to an extension of time for the respondent to file his brief and did not want to delay this decision pending the Washington v. Harper, 58 U.S.L.W. 4249 (1990) decision.
The Respondent refers to the order entered by this Court on July 21, 1989. Prior to the July 21, 1989 order the parties were also before the Court on May 23, 1989. On that date the Respondent also moved for an extension of time in which to file his brief. In stating the reason for requesting an extension of time in which to file his brief,
counsel for the respondent stated:
 I'm going on vacation. I've been wrapping things up. I will be gone from May 24th through June 13th and I just simply have not had a chance to address the important issues here.
 Secondly, Your Honor, this a case of utmost importance and complexity. This is a very important issue, just — and it's an important issue not for Mr. Cliff. It's an issue that transcends Mr. Cliff. The right of prison authorities to administer antipsychotic medications to inmates against their will is — I would say, probably the most important issue I've dealt with in habeas court since I've been here.
 The fact that it's important, I think, is also indicated by a decision of the United States Supreme Court on March 6th, 1989. On that date, it granted certiorari on a case from Washington State. And that case, Your Honor, was Washington versus Harper. And it's on a Supreme Court docket, number 88599. And that's reflected in 57 U.S. Law Week, 3599. And the lower court decision, Your Honor, is a Harper vs. State, 759 P.2d 358. And it's a Washington 1988 case.
CT Page 2097
In response to the Court's question to counsel for the respondent whether the issue of mootness would be raised in the event an extension of time was granted for the Respondent to file its brief, the following occurred:
 THE COURT: I would like to have a response to it, the reason being as you pointed out, this is a case of some significance and if as a result of any extensions of time that the Respondent receives it may result in the Respondent then using those extensions of time as a possible basis for claiming mootness following the discharge of the Petitioner. To that extent, extensions of time may or may not be granted or the decision to grant the request may be influenced to some extent by whether or not mootness will become an issue in the event the Petitioner discharges and I would like to have an answer on the record as to whether or not the Respondent will claim mootness in the event the Petitioner should discharge prior to the time a decision is rendered.
 MR. BIGGAR: Well, Your Honor, you may a good point. I'm kind of caught between a rock and a hard place and I think you're well aware of that. All — I guess I'm going to have to concede that it would be unfair for us to ask for extensions of time and then go ahead and claim mootness. I would point out, however, Your Honor, that if this goes to the Appellate Court — and I don't see chronologically how it can, I think your decision is going to be able the only decision in this case — because by the time you decide the case before an appeal can be totally perfected and argued and decided by the Appellate Court that would probably make it moot. No matter whether this extension is granted or not, I just would caution the Court of the fact that that may occur. But I am willing to concede — although Mr. Kent has probably asked for as many extensions as I have — at least in length of time, that it would be unfair for the State or the Respondent to claim mootness at the trial level.
Having represented to the Court on May 23, 1989 in connection with his request for an extension of time in which to file the reply brief that the issue of mootness would not be raised by the respondent, the respondent now argues that he is not prohibited from raising the claim at this time. CT Page 2098
The issue is whether the Court has the right to rely on representations made by counsel when those representations are made in connection with a request for an extension of time. The Court believes it has a right to rely on representations made by counsel and that counsel should be bound by such representations. State v. Williams, 203 Conn. 159,170 (1987). The respondent filed five (5) motions for extension of time to file his brief. The first was dated April 25, 1989 and the last August 16, 1989. The motions dated July 30, 1989 and August 16, 1989 were filed after the Court's Order of July 21, 1989 and after counsel's representations on May 23, 1989 that it would be unfair to ask for extensions of time to file its brief and then claim mootness. This Court granted the respondent its request for extensions of time to file its brief and did not impose any sanctions for failing to provide access to the courts to the petitioner based on counsel's representations of May 23, 1989. See Gaines v. Manson, 194 Conn. 510, 516 (1984). However, since the respondent has in fact raised the issue of mootness it is necessary for the Court to reach the merits of that claim.
The Court agrees with the representation that was made by counsel for the respondent and finds that this case is of utmost importance as it affects the ongoing program at Somers to administer antipsychotic medications to inmates against their will. In Taylor v. Robinson, 171 Conn. 691, 694 (1976) the issue that was raised was whether the granting of parole to a habeas corpus petitioner made his claim moot. The Taylor court stated in part as follows:
 In the interim between the trial court's judgment and the perfection of this appeal, the plaintiff has been granted parole. Under similar circumstances, the United States Supreme Court has dismissed challenges to parole board procedures as moot. Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350; Regan v. Johnson, 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289, vacating United States ex rel. Johnson v. Chairman, New York State Board of Parole, 500 F.2d 925 (2d Cir.). Despite the plaintiff's lack of an immediate interest in the outcome of this appeal, we are persuaded that we should consider the merits of the plaintiff's claim that the UAPA is applicable to parole release hearings. Recently, in Liistro v. Robinson, 170 Conn. 116, 365 A.2d 109, we reached the merits of the plaintiffs' claim that they were entitled to bail pending the outcome of parole revocation proceedings, even though, by CT Page 2099 the time the appeal was argued, the proceedings to revoke the plaintiffs' parole had been complete. We noted (p. 121) that "[t]he single issue involved is one which is `capable of repetition, yet evading review.' Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310. . . . It directly affects the ongoing parole program of the state's penal system, and could very well affect the petitioners. . . . Hence, practical relief can follow directly from our decision and `the public importance of the question involved makes it desirable that we decide the point.' Winnick v. Reilly, 100 Conn. 291, 296, 123 A. 440.
The issue that is involved in this case is one that is capable of repetition yet evading review. It directly affects the ongoing right of prison authority to administer psychotropic and antipsychotic medications to inmates against their will. The public importance of the question involved makes it desirable that the issue be decided. The Court therefore overrules the respondent's claim of mootness based on Taylor, supra.
The issue of mootness was also raised in Washington v. Harper, supra. In rejecting that claim the court at 58 U.S.L.W. 4252 stated as follows:
 Respondent contends that because the State has ceased administering antipsychotic drugs to him against his will, the case is moot. We disagree.
 Even if we confine our attention to those facts found in the record, a live case or controversy between the parties remains. There is no evidence that respondent has recovered from his mental illness. Since being sentenced to prison in 1976, he has been diagnosed and treated for a serious mental disorder. Even while on parole, respondent continued to receive treatment, at one point under a civil commitment order, at state mental hospitals. At the time of trial, after his transfer from the Center for a second time, respondent was still diagnosed as suffering from schizophrenia.
 Respondent continues to serve his sentence in the Washington state prison system, and is subject to transfer to the Center at any time. Given his medical history, and the fact that he has been CT Page 2100 transferred not once but twice to the Center from other state penal institutions during the period 1982-1986, it is reasonable to conclude that there is a strong likelihood that respondent may again be transferred to the Center. Once there, given his medical history, it is likely that, absent the holding of the Washington Supreme Court, Center officials would seek to administer antipsychotic medications pursuant to Policy 600.30.
 On the record before us, the case is not moot. The alleged injury likely would recur but for the decision of the Washington Supreme Court. This sufficiently overcomes the claim of mootness in the circumstances of the case and under our precedents.
See Vitek, 445, U.S., at 486-487.
This Court therefore further overrules the respondent's claim of mootness based on Washington v. Harper, supra.
The respondent in his brief at page 16, footnote 6 contends that this case is not ripe for decision since the petitioner had not been subjected to involuntary medication under the current policy before trial and therefore submits that the petition is not ripe for decision and should be dismissed. The Court is not persuaded by that argument. The respondent made no claim during the course of the trial and did not raise any claim in the pleadings that the current policy regarding the involuntary administration of psychotropic and antipsychotic medication was outside of the scope of this case. The Court further finds from the testimony of Dr. Venters that even before the current policy was promulgated on August 30, 1988 that the medication given to the petitioner was basically in accordance with the current policy. The Court further finds from the testimony of Dr. Van Der Werff that the prior procedures under the prior policy in effect immediately before the current was promulgated was similar to the current policy and that the current policy promulgated on August 30, 1988 was essentially already in place prior to its adoption. Further, the respondent cites no case law for its "ripeness" argument. The Court therefore overrules the respondent's claim of ripeness.
The Court also notes that at the May 23, 1989 argument that counsel for the respondent stated:
 Since the trial, Your Honor, he hasn't been medicated involuntarily since February 22, 1989. CT Page 2101 I'm not sure that's relevant for the purposes of the brief I'm going to write, Your Honor. I haven't decided that as yet but I think it's very relevant for the purposes of this extension of time. He's not been involuntarily medicated since February 22 —
The Court accepts that representation made by counsel and finds that the petitioner has been involuntarily medicated as of February 22, 1989 under the existing policy.
It is therefore necessary to reach the merits of the petitioner's claims.
V. THE PETITIONER'S DUE PROCESS CLAIM
The threshold issue to the due process claim is whether the petitioner has a United States Constitution or State liberty interest in this case. In addressing that issue the respondent states as follows:
 The Supreme Court, then apparently decided that involuntary medication of mentally ill prisoners in Washington State involves a liberty interest under the Due Process Clause of the Fourteenth Amendment and under state law. 55 U.S.L.W., at 4252. Assuming arguendo, that both a Federal and a State liberty interest exists in this case, respondent contends that such a finding avails petitioner absolutely nothing since the critical question is whether the CCI, Somers, policy meets minimum due process requirements.
Since the respondent does not admit that a liberty interest exists in this case it is necessary to address that issue.
In addressing the issue of whether the prisoner in Washington v. Harper, supra., had a protected liberty interest to avoid unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment, the court stated in part as follows on pages 4252-4253:
 The Washington Supreme Court's decision, as a result, has both substantive and procedural aspects. It is axiomatic that procedural protections must be examined in terms of the substantive rights at stake. But identifying the contours of the substantive right remains a task distinct from deciding what procedural protections CT Page 2102 are necessary to protect that right. "[T]he substantive issue involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. The procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." Mills v. Rogers, 457 U.S. 291, 299 (1982) (citations omitted).
 Restated in the terms of this case, the substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient. The Washington Supreme Court in effect ruled upon the substance of the inmate's right, as well as the procedural guarantees, and both are encompassed by our grant of certiorari. We address these questions beginning with the substantive one.
 As a matter of state law, the Policy itself undoubtedly confers upon respondent a right to be free from the arbitrary administration of antipsychotic medication. In Hewitt v. Helms, 459 U.S. 460 (1983), we held that Pennsylvania had created a protected liberty interest on the part of the prison inmates to avoid administrative segregation by enacting regulations that "used Language of an unmistakably mandatory character, requiring that certain procedures `shall,' `will,' or `must' be employed, and that administrative segregation will not occur absent specified substantive predicates — viz., `the need for control' or `the threat of a serious disturbance.'" Id., at 471-472 (citations omitted). Policy 600.30 is similarly mandatory in character. By permitting a psychiatrist to treat an inmate with antipsychotic drugs against his wishes only if he is found to be (1) mentally ill and (2) gravely disabled and dangerous, the Policy creates a justifiable expectation on the part of the inmate that the drugs will not be administered unless those conditions exist. See also Vitek, 445 U.S. at 488-491.
CT Page 2103
 We have no doubt that, in addition to the liberty interest created by the State's Policy, respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment. See Id., at 491-494; Youngberg v. Romeo, 457 U.S. 307, 316 (1982); Parham v. J.R., 442 U.S. 584, 600-601 (1979). Upon full consideration of the state administrative scheme, however, we find that the Due Process Clause confers upon respondent no greater right than that recognized under state law. (Emphasis provided).
The regulations of the respondent allow for the administration of psychotropic and antipsychotic medication against an inmate's will only in a mental health emergency. A mental health emergency is defined as a situation in which the prescribing psychiatrist has determined that the inmate is an imminent danger to himself or others or is so gravely disabled that he cannot exercise adequate judgment to insure his safety within a maximum security environment. While the respondent's regulation differs from the regulation in Washington v. Harper, supra, in that the respondent's regulation does not define the terms "imminent danger" or "gravely disabled" and those terms are defined in the regulations in Washington v. Harper, supra, the Court does not consider that distinction to be controlling. The Court does consider the fact that the regulations in this case as well as in Washington v. Harper, supra, in each instance prohibit the involuntary medication in question unless there is a finding that the inmate is an imminent danger to himself or others or is gravely disabled to be controlling. The Court therefore concludes that the regulations of the respondent in this case creates a justifiable expectation on the part of the inmate that the drugs will not be administered unless those conditions exist. As held in Hewitt v. Helms, 459 U.S. 460 (1983) a protective liberty interest is created on the part of prison inmates where a regulations uses language of an unmistakably mandatory character requiring that certain procedures shall, will, or must be employed. Further, the Court holds in accordance with Washington v. Harper, that in addition to the liberty interest created by the respondent's involuntary medication policy that the petitioner possesses a significant liberty interest in avoiding the unwarranted administration of antipsychotic or psychotropic drugs under the Due Process Clause of the Fourteenth Amendment.
The next issue that is involved is an identification of CT Page 2104 the conditions under which competing state interest can out weigh the petitioner's liberty interest in avoiding unwarranted administration of medication. In discussing this issue the Washington court stated in part as follows at page 4253:
 The Policy under review requires the State to establish, by a medical finding, that a mental disorder exists which is likely to cause harm if not treated. Moreover, the fact that the medication must first be prescribed by a psychiatrist, and then approved by a reviewing psychiatrist, ensures that the treatment in question will be ordered only if it is in the prisoner's medical interests, given the legitimate needs of his institutional confinement. These standards, which recognize both the prisoner's medical interests and the State's interests, meet the demands of the Due Process Clause.
 The legitimacy, and the necessity, of considering the State's interests in prison safety and security are well established by our cases. . . .the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is "reasonably related to legitimate penological interests." . . . when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests". . .
While this Court recognizes the difference between this regulation and the regulation found in Washington v. Harper, supra, nevertheless in reviewing this regulation under the standard of "reasonably related to legitimate penological interests" the Court holds that this regulation is valid.
The remaining issue is to determine what procedural protections are necessary to ensure that the decision to medicate an inmate against his will is neither arbitrary nor erroneous. In discussing that issue the court in Washington v. Harper, supra, at pages 4254 — 4256 stated in part as follows:
 . . . . As written, the Policy requires that the decision whether to medicate an inmate against his will be made by a hearing committee composed of a psychiatrist, psychologist, and the Center's Associate Superintendent. None of the committee CT Page 2105 members may be involved, at the time of the hearing, in the inmate's treatment or diagnosis; members are not disqualified from sitting on the committee, however, if they have treated or diagnosed the inmate in the past. The committee's decision is subject to review by the Superintendent; if the inmate so desires, he may seek judicial review of the decision in a state court. . . . The procedural protections required by the Due Process Clause must be determined with reference to the rights and interest at stake in the particular case. Morrissey v. Brewer, 408 U.S. 471, 481 (1972); Hewitt, 459 U.S., at 472; Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 12 (1979). The factors that guide us are well established. "Under Mathews v. Eldridge, 424 U.S. 319, 335 (1976), we consider the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment." Hewitt, supra, at 473.
 Respondent's interest in avoiding the unwarranted administration of antipsychotic drugs is not insubstantial. The forcible injection of medication into an nonconsenting person's body represents a substantial interference with that person's liberty. . . .Notwithstanding the risks that are involved, we conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge. The Due Process Clause "has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer." Parham, 442 U.S., at 607. Though it cannot be doubted that the decision to medicate has societal and legal implications, the Constitution does not prohibit the State from permitting medical personnel to make the decision under fair procedural mechanisms. . . .A State's attempt to set a high standard for determining when involuntary medication with antipsychotic drugs is permitted cannot withstand challenge if there are no procedural safeguards to ensure the prisoner's interests are taken into account. Adequate procedures exist here. In particular, independence of the decisionmaker is addressed to our satisfaction by these procedures. None of the CT Page 2106 hearing committee members may be involved in the inmate's current treatment or diagnosis. . . .The procedures established by the Center are sufficient to meet the requirements of due process in all other respects,. . .The Policy provides for notice, the right to be present at an adversary hearing, and the right to present and cross-examine witnesses. . . .allowing respondent to contest the staff's position at the hearing satisfies the requirement that the opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." (Emphasis provided).
In comparing the involuntary medication regulation in issue to the procedural protections found necessary in Washington v. Harper, supra, to insure that the decision to medicate an inmate against his will is neither arbitrary nor erroneous, this Court concludes that the regulation in issue does not meet the procedural protections guaranteed by the Due Process Clause for the following reasons:
(1) Independence of Decisionmaker
This regulation provides that the panel shall be chaired by the director and consists of the prescribing psychiatrist, at least one other psychiatrist and other staff as deemed appropriate. This regulation is compared to that Washington v. Harper, supra, that requires that the decision to medicate an inmate against his will be made by a hearing committee composed of a psychiatrist, psychologist and the Center's Associate Superintendent, none of whom may be involved at the time of the hearing in the inmate's treatment or diagnosis. The Washington v. Harper court addressed this exact type of situation when it stated at page 4956 as follows:
 Adequate procedures exist here. In particular, independence of the decisionmaker is addressed to our satisfaction by these procedures. None of the hearing committee members may be involved in the inmate's current treatment or diagnosis.
This Court concludes that having the prescribing psychiatrist on the panel whose function is to review his own findings does not allow for independence of the decisionmaker.
(2) Notice Requirement
The notice requirements as found in Washington v. Harper, at 4251 are as follows: CT Page 2107
 He must be given at least 24 hours' notice of the Center's intent to convene an involuntary medication hearing, during which time he may not be medicated. In addition, he must receive notice of the tentative diagnosis, the factual basis for the diagnosis, and why the staff believes medication is necessary.
The regulation in issue does not provide for any of the notice protections that existed in Washington v. Harper, supra. The Court therefore concludes that the regulation is procedurally defective for failure to have adequate notice provisions.
(3) The Right To Be Present At Adversary Hearing Including The Right To Present Witnesses And Cross-Examine Witnesses.
The Washington regulation, as found by the Court at page 4951 including the following:
 At the hearing, the inmate has the right to attend; to present evidence, including witnesses; to cross-examine staff witnesses.
This regulation in issue provides that the panel will interview the inmate and arrive at a decision. The Court reads the regulation as allowing for the witness to be present during the interview process. There is no provision in the regulation allowing the inmate to be present during the full panel proceeding. There is no provision in the regulation giving the inmate the right to present any evidence. There is no provision in the regulation giving the inmate the right to present witnesses. There is no provision in the regulation giving the inmate the right to cross-examine staff witnesses. This Court concludes that the regulation is procedurally defective as a result of failing to give the inmate the right to be present at an adversary hearing including the right to present evidence and witnesses and to cross-examine witnesses. The regulation does not allow for the inmate to be heard in a meaningful manner.
The Court is aware of the fact that the regulation in issue differs from the Washington regulation in two other respects: (a) the regulation in issue does not provide for an appeal to the Warden and the regulation in issue does not give to the inmate the assistance of a lay advisor at the panel hearing. However, this Court does not consider those differences to be of sufficient magnitude to rule the regulation procedurally defect. CT Page 2108
VI. THE PETITIONER'S EQUAL PROTECTION CLAIM
The conclusion reached by the Court that the regulation violates procedural due process fully addresses the claim of the petitioner and makes it unnecessary to reach his equal protection claim. Constitutional issues are not considered unless absolutely necessary to the decision of a case. Alexander v. Robinson, 185 Conn. 540, 548 (1981).
VII. DUE PROCESS VIOLATION REMEDY
Gaines v. Manson, 194 Conn. 510 (1984) established that in the adjudication of petitions for habeas corpus, the remedies available to a court depend upon the constitutional rights being vindicated. The court has the power to dispose of the case as "law and justice require".
ORDER
The respondent is ordered to amend his involuntary medication regulations in the following respects within sixty (60) days from the date this decision is filed:
1) Eliminate the prescribing psychiatrist as a member of the panel.
2) Adopt provisions giving to the inmate the right to be present at the full panel hearing, the right to notice, the right to present evidence and witnesses and testimony and the right to cross-examine witnesses all of which is to be in substantial conformity with the regulation that exists in Washington v. Harper, supra.
Axelrod, J.